UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In Re: FN BUILDING, L.L.C. | Case No. 11-46947 |
| | Chapter 11 |
| Debtor. | Hon. Marci B. McIvor |

**CREDITOR AND TENANT HONIGMAN MILLER SCHWARTZ AND COHN LLP'S REQUEST THAT DEBTOR INCLUDE INFORMATION IN ITS DISCLOSURE STATEMENT**

Pursuant to 11 U.S.C. §1125, Bankruptcy Rule 3016, this Court's Order Setting Deadlines entered on April 7, 2011, and this Court's Requirements for Information to Include in the Combined Plan and Disclosure Statement ("Requirements for Information"), Creditor and Tenant Honigman Miller Schwartz and Cohn LLP ("Honigman") requests that Debtor include the following in its Disclosure Statement.

I. **THE FOLLOWING INFORMATION SHOULD BE INCLUDED IN THE BACKGROUND SECTION OF THE DISCLOSURE STATEMENT TO PROVIDE INTERESTED PARTIES WITH ADEQUATE INFORMATION**

   A. **History of Mismanagement by Debtor of Its Sole Real Estate Asset That Led to the Appointment of a Receiver**

Debtor, a single asset real estate entity, owns, but does not operate its sole asset—a 25-story landmark commercial office building in downtown Detroit (the "Building"). Debtor's mismanagement of the Building was a significant factor in the Wayne County Circuit Court's appointment of a Receiver and property manager for the Building in September 2009. At the time the Receiver was appointed, the Building was in foreclosure, and Debtor had swept all available cash from the Building's accounts but had not paid for many of the Building's operating expenses, needed repairs and capital improvements. Debtor had left a trail of creditors,

disgruntled tenants, and a decaying building infrastructure in its wake. Since the fall of 2009, the Receiver and property manager have managed to stabilize the Building by using Debtor's rent roll for repairs and other operating expenses.

The Wayne County Circuit Court case (No. 09-021031-CK, Judge John A. Murphy) arose when National City Bank (now known as PNC Bank) (the "Bank"), among other things, sought to have a Receiver appointed for the Building. The Bank was the lender to the Building's owner—Debtor, and also held a mortgage and other security on the Building and its rents. Debtor was the landlord to the tenants in the Building. Debtor, in turn, was ultimately owned, operated and controlled by Alex Dembitzer and his mother Jacqueline Fried (the "Dembitzers").

The largest tenant is the law firm of Honigman Miller Schwartz and Cohn LLP ("Honigman"), which leases approximately five full floors and employs approximately 400 individuals at the Building. Honigman has been a tenant in the Building since 1948, the year the firm was founded. Other notable tenants include United Way of Southeastern Michigan, Lewis & Munday, PC, and the City of Detroit Law Department.

Honigman intervened in the Wayne County Circuit Court case to, among other things, support the Bank's effort to have a Receiver and a professional commercial property manager appointed for the Building. The primary evidentiary support for the Bank's motion to have a Receiver appointed was an affidavit from Honigman's Chief Operating Officer describing the absolutely horrendous condition of the Building while it was owned and being managed by Debtor.

At the time of these events, there were several acute, emergency situations at the Building. Fall and winter were approaching, but Debtor and the Dembitzers had no plans as to how the Building was going to be heated. They had kept the rents generated by the Building, but

not paid the steam heat supplier and had no ability to provide heat. This was a critical issue and one of the first that the Receiver had to address. In addition, because of the lack of maintenance in the Building by Debtor and the Dembitzers, a flood from the roof in August 2009 shorted out the main electrical supply to much of Honigman's space and the Building. A makeshift electric supply system has been in place since that time, for more than one year, involving thick, live electric cables running through the stairwell of the Building, which also serves as an emergency exit for the Building. The Receiver has taken the responsibility for completely repairing this electric cable issue.

Under Debtor's and the Dembitzers' ownership and management, and continuing into even some of the Receiver's tenure, the Building's life safety system was in chronic disrepair and routinely malfunctioned. False fire alarms were common, often causing all of Honigman's staff to fully or partially evacuate the Building down dark, wet stairwells. Many fire and building code violations existed, and the Detroit Fire Department had even filed a criminal misdemeanor complaint against Debtor's Building manager. Under Debtor's ownership and management, the heating, air conditioning, hot water and elevator service for the Building suffered serious, chronic deficiencies. Elevators routinely trapped people for lengthy time periods, and also dropped, jerked, shook and experienced a variety of serious malfunctions. Notwithstanding having to endure these deplorable conditions that existed due to Debtor's mismanagement of the Building, Honigman has persevered for many years in its dedication to retain a strong presence in Detroit.

In the Bank's motion and brief for appointment of a Receiver, it argued that a Receiver needed to be appointed for the Building on an emergency basis because of the "gross mismanagement" of Debtor. As evidence of that gross mismanagement, and as noted above, the

Bank relied extensively on the facts in the affidavit of Honigman's Chief Operating Officer, Robert Kubic, which detailed some of Debtor's material breaches of Honigman's lease. The Receiver was appointed on an emergency basis after the Bank stated to the Court the following, which are quotes from the Bank's motion and brief:

- "because of serious life safety issues and waste;"

- "it is difficult to imagine a more compelling set of facts;"

- "significant life safety and habitability issues exist evidencing a pattern of gross mismanagement of the Building by [Debtor] FNB;"

- "the tenants of the Building, including Honigman . . . have experienced, and continue to experience, significant habitability problems due to [Debtor] FNB's failure to responsibly manage the Building;"

- "The life safety system, the primary purpose of which is to alert tenants and the fire department in the event of a fire, is not working properly. . . . Numerous false fire alarms have occurred during the past year, many of which have resulted in the evacuation of thousands of people from the building;"

- There is a "serious threat to human safety in the Building;"

- "The Building has been without heat since approximately May, 2009;"

- "The Building's air conditioning system is also not working properly."

In the Wayne County Circuit Court proceedings, detailed and elaborate proposed factual findings and evidence were provided to the Court and/or were available to prove what is generally summarized above as to the history of mismanagement by Debtor of the Building.

The mismanagement of the Building by Debtor is also further evidenced by the affidavit filed in this bankruptcy proceeding of Brian Bass, Vice-President of Property Management at Finsilver/Friedman Management Corporation ("Finsilver"). Finsilver was the property manager of the Building from approximately September 2002 through September 2005. In December 2009, Finsilver resumed as property manager (and had previously been appointed in September

2009 briefly as Receiver) of the Building. Bass attested that Debtor had allowed numerous acute problems to persist without repair. Debtor's neglect of the Building resulted in problems with the air conditioning towers, life safety system, elevators, plumbing leaks and standing water in the basement, failure to replace broken windows, and dangerous problems with the electricity infrastructure. He also attested that Debtor's failure to pay vendors resulted in unsafe and unsanitary conditions including lack of heat to the Building, and cessation of trash pickup which resulted in the janitorial crew storing trash on vacant floors instead of properly disposing of it.

Since the Wayne County Circuit Court's appointment of the Receiver, O'Keefe & Associates Consulting, LLC ("O'Keefe"), in combination with the property manager Finsilver, the condition of the Building has stabilized. However, many infrastructure issues remain to be addressed, and Honigman has yet to receive any redress for the enormous damage it has suffered.

In November 2010, about one year after the Receiver and property manager were installed, FNB Detroit 2010, LLC ("FNB Detroit"), a Dembitzer-related entity, purportedly purchased the underlying note and mortgage from the Bank, and now asserts a first mortgage claim against the Building in the amount of $25,723,000. FNB Detroit is an affiliate of the Debtor and is "working closely" with the Debtor. (*See, In re FN Building, LLC*, Case No. 11-10266, United States Bankruptcy Court for the Southern District of New York: Docket #5, Application for Authority to Use Cash Collateral, ¶6, Docket #33, Objection to Receiver's Motion, ¶¶ 6, 15, 29; Docket #60, Objection to Motion to Dismiss or Transfer Venue, ¶¶ 6, 9). The new FNB Detroit entity's first order of business was to move in the Wayne County Circuit Court to terminate the receivership. That effort was met with objections from the creditors, tenants, and the Receiver. Debtor filed the within Chapter 11 case before the Wayne County

Circuit Court's hearing on whether the Receiver should stay in place despite the transfer of the note and mortgage.

Since the filing of this case, Debtor has stated to the Bankruptcy Court that it "has agreed to continue the receiver-in-possession through the outcome of the case" and that the "receiver being in place stabilizes whatever's going on in Michigan in terms of operational issues." *See* March 3, 2011, Hearing Transcript pp. 9, 21, S.D.N.Y. *See also, Id.*, p. 23 ("The tenants, they have issues but they have their receiver, that's stabile [sic]"). Thus, Debtor acknowledges that the Receiver should remain in place throughout this case in order to provide stability to the ongoing operations of the Building. Further, FNB Detroit also acknowledged that the Receiver "will deal with [the]day-to-day operations and maintain what is there." *Id.*, p. 28. The Bankruptcy Court ordered in its Final Order Authorizing Use of Cash Collateral entered on March 30, 2011 (Doc. 44), and in prior similar, interim cash collateral orders, that the Receiver and property manager will remain in place to fully operate and manage the Building.

B. **Debtor's and Its Affiliate's Misuse and Misappropriation of Insurance Proceeds Advanced to Repair the Building**

As noted, in August 2009, when Debtor owned and managed the Building, there was flooding in the Building. The cause of the flood was a large roof-mounted air conditioning unit being plumbed to drain into a janitor's sink on the 24th floor of the Building. The sink clogged and the resulting overflow caused a flood of the entire stairwell from the 24th floor to the ground floor, which contains critical components of the Building's electrical infrastructure. There was significant damage to the Building.

Debtor, in conjunction with its affiliate, Zul Capital, LLC ("Zul"), submitted a related initial insurance claim to the Building's insurer. The insurer advanced $500,000 for repairs, with the balance of the claim to be determined later. The $500,000 advance from the insurer was paid

6
11-46947-mbm    Doc 60    Filed 04/15/11    Entered 04/15/11 12:22:32    Page 6 of 13

to Zul. **Zul did not use any of the advance to make repairs to the Building, but instead kept the advance for its own use.** Prior to the instant Chapter 11 case, proceedings in the Wayne County Circuit Court, which have now been automatically stayed, were ongoing concerning the diversion of the $500,000 insurance advance. Such proceedings embroiled the insurer, Zul, Debtor, the Receiver, and the primary contractor (Statewide Restoration) that had provided the bulk of the initial repair work from the flood. Statewide Restoration has still not been paid for all of this work. In addition, the remaining portion of the insurance claim from the 2009 flood and related damage is still being adjusted and negotiated with the insurer. The ultimate resolution of this insurance claim is still unknown.

Another flood occurred recently (in February 2011) in the vicinity of the 17th floor of the Building, and an insurance claim is being pursued with the insurer concerning that as well. The ultimate resolution of that insurance claim is also unknown.

### C. Honigman's Lease Termination Litigation

On September 2, 2009, Honigman filed a lawsuit in Wayne County Circuit Court (Case No. 09-021695-CK) against its landlord—Debtor. At that time, there was no heat in Honigman's premises, the life safety system did not work, there were serious building and fire code violations, and numerous electrical, air conditioning, elevator and other serious problems existed affecting Honigman's premises. Count IV of Honigman's Complaint sought a declaration that Debtor had materially breached its lease with Honigman, and that Honigman could validly terminate the lease and vacate the premises. The case was originally assigned to Judge Kathleen MacDonald. Judge MacDonald ordered that Count IV of the Complaint for a declaratory judgment be expedited for trial on October 19, 2009.

7
11-46947-mbm    Doc 60    Filed 04/15/11    Entered 04/15/11 12:22:32    Page 7 of 13

On October 18, 2009, the Receiver at the time (Finsilver), which Wayne County Circuit Court Judge Murphy had appointed for the Building a few weeks earlier in another case, moved to intervene, to adjourn that trial date, and to compel arbitration. Judge MacDonald allowed the Receiver to intervene, adjourned the trial on the declaratory judgment count to December 1, 2009, and took the motion to compel arbitration under advisement. Just prior to the December 1 trial date, Judge MacDonald transferred the case to Judge Murphy, and the Receiver then filed a renewed motion to compel arbitration. On December 7, 2010, Judge Murphy entered an order granting the motion to compel arbitration.

On December 23, 2010, Honigman timely filed in the Michigan Court of Appeals (Case No. 301735) an application for leave to appeal Judge Murphy's order compelling arbitration. That application for appeal, which was fully briefed, was automatically stayed when Debtor filed the instant Chapter 11 case. The issue of whether Honigman may terminate its lease and vacate the premises due to Debtor's breach of the lease has not yet been determined by a Court or by arbitration.

> D. **Potential Challenge to the Claims, Interests and Voting of FNB Detroit and Zul, Seeking to Have such Claims, Interests and Voting Subordinated, Recharacterized and/or Treated as Equity in Debtor**

Elsewhere in the Disclosure Statement, Debtor has identified FNB Detroit as a claimant with an interest and voting rights of a secured creditor, and Zul as a claimant with an interest and voting rights of an unsecured creditor. Honigman has notified Debtor that it may challenge these purported claims, interests and voting rights of FNB Detroit and Zul under 11 U.S.C. §§105 and 510(c), and corresponding case law. Specifically, Honigman may seek to have such claims, interests and voting rights subordinated, recharacterized and/or treated as equity in Debtor.

Honigman has already propounded (but not obtained) discovery to further investigate the related issues.

### E. The Disclosure Statement Omits the Claims of Honigman and Statewide Restoration

The Disclosure Statement purports to identify all general unsecured claims. However, the amounts listed do not account for the claims of Honigman, Statewide Restoration, and perhaps others.

Statewide Restoration performed the initial repairs in the Building after the August 2009 flood. Its services were the primary basis for Debtor's and Zul's obtaining the $500,000 advance from the Building insurer for that flood. However, Statewide Restoration was not paid, and its claim is not accounted for in the Disclosure Statement.

Honigman's claim is also not accounted for in the Disclosure Statement. Honigman has suffered significant damages resulting from Debtor's prepetition breaches of its lease, for which Honigman has a claim against Debtor, estimated to be in excess of $1 million, consisting of the following components:

(1) Attorney fees incurred in enforcing Honigman's rights under the lease;

(2) Business interruption of lost attorney and staff time due to Debtor's breaching the lease;

(3) Damages from not having premises of the quality required by the lease (i.e., getting stuck in elevators, poor heating, A/C…); and

(4) Lost time of management and administrative personnel spent addressing the problems with the Building caused by the Debtor breaching the lease.

These, and any other claims omitted in the Disclosure Statement, are important considerations for interested parties.

### F. Motion of Honigman to Dismiss the Chapter 11 Case of Debtor Pursuant to 11 U.S.C. §305(a)(1) and/or 11 U.S.C. §1112(b), or Alternatively for the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. §1104(a)(1) and (2)

There is pending in this case, but currently being held in abeyance, a motion of Honigman to dismiss the Chapter 11 case of Debtor pursuant to 11 U.S.C. §305(a)(1) and/or 11 U.S.C. §1112(b), or alternatively for the appointment of a Chapter 11 trustee pursuant to 11 U.S.C. §1104(a)(1) and (2). That motion is also supported by a reply brief that has been filed by Honigman. The bases for the relief requested are set forth in those court papers.

### G. Debtor Did Not Schedule Its Tenants

Debtor's Schedule G does not list Debtor's executory contracts. Upon information and belief, many of Debtor's tenants are not scheduled, and thus do not have notice of the bankruptcy case or the claims bar date.

### II. THE FOLLOWING INFORMATION NEEDS TO BE INCLUDED IN THE DISCLOSURE STATEMENT, BUT THE INFORMATION IS IN THE CONTROL OF DEBTOR SUCH THAT ONLY DEBTOR CAN PROVIDE IT AS IT IS UNAVAILABLE TO HONIGMAN WITHOUT DISCOVERY

1. Detailed information on the principals, ownership, management, organizational relationships, tax consequences and agreements between and among Debtor, FNB Detroit, Zul, Skyloft LP ("Skyloft"), and Sky Management Services, LLC ("Sky"), including without limitation, Alexander Dembitzer, Jacqueline Fried, Steven Jason, Lorenzo Cesare and David Kriss. This information is required under Section II of the Court's Requirements for Information. It is also necessary so that all interested parties have adequate information under 11 U.S.C. §1125(a)(1) to determine the identities of insiders and affiliates of Debtor. This information is directly relevant to the Disclosure Statement's identification of Debtor's various

classes of creditors and any voting by such creditors. The same comment also applies to many of the requests listed below.

2. Describe in detail whether the following entities have shared any of the same decision-makers, employees and/or office space, and whether they have filed consolidated tax returns, and identify such decision-makers, employees, office space and tax returns:

- Debtor
- FNB Detroit
- Zul
- Skyloft
- Sky

3. Describe the formation and governance of Debtor, FNB Detroit, Zul, Skyloft, Sky and any entity that is a member, manager, shareholder, owner, general partner or limited partner of such entities.

4. Describe the federal, state, local and any other tax ramifications to Debtor, FNB Detroit, Zul, Skyloft, Sky and any other affiliates or insiders if the Plan of Reorganization is confirmed.

5. Identify in detail the documents that show FNB Detroit properly and validly purchased, was assigned, and perfected its interests in the note, mortgage, security interests and related items pursuant to which Debtor identifies it as a secured and unsecured creditor.

6. Describe the source of the funds used by FNB Detroit to acquire its interests in the note, mortgage and related items concerning Debtor and the Building.

7. Include a description of what will happen under the Plan of Reorganization with respect to prepetition litigation involving Debtor, including, for any litigation that will continue, in what court it will continue, who will defend or prosecute such litigation, how such defense or prosecution will be funded, and how any recovery will be distributed (i.e. insurance proceeds).

8. Identify in detail, in connection with the 2009 and 2011 floods at the Building, the potential claims and status regarding the recovery of any of the insurance proceeds that were already converted or diverted from Debtor, and the recovery of insurance proceeds that are still being pursued from the insurer. If Debtor does not intend to pursue any such claims, explain why. In addition, how will any insurance recovery be distributed. (*See* Section IV.C. of the Court's Requirements for Information).

9. Describe the legal theory of how Debtor can be the disbursing agent under the Plan in light of the Receiver's role under the Final Cash Collateral Order.

10. Explain whether unexpired leases that will be assumed will be transferred by Debtor to a buyer, since Debtor will no longer own the Building after the sale contemplated by the Plan.

11. Explain how the requirements of 11 U.S.C. §365 will be satisfied where leases are being assumed and assigned, such as adequate assurance of prompt cure and adequate assurance of future performance.

12. Make changes to reflect Michigan references instead of New York where appropriate.

13. Provide the Purchase Contract that is supposed to be attached as Exhibit A to the Plan of Reorganization, which is not currently attached to Debtor's Disclosure Statement or Plan of Reorganization.

14. Describe in more detail what is supposed to happen in the event that the proposed Exhibit A sale does not occur, and the Exhibit B to the Plan of Reorganization bidding sale occurs, such as:

- Who runs the sale process—the Receiver or Debtor.

- Whether a minimum bid will be required and how this will impact distributions under the Plan.

- Whether the bidding requirements will include objective criteria of acceptable experience in owning, managing, and funding commercial office buildings.

- The process of assumption and assignment of leases, and how the requirements of 11 U.S.C. §365 will be satisfied where leases are being assumed and assigned, such as adequate assurance of prompt cure and adequate assurance of future performance.

15. Describe Debtor's prepetition efforts to reorganize or restructure its finances and/or operations.

Pursuant to the Court's Order Setting Deadlines entered on April 7, 2011, please let Honigman know if the Debtor will not be including any of the above-referenced information in the Disclosure Statement to be filed on or before April 26, 2011, so that any disputes can be submitted to the Court for informal resolution before Debtor files the Disclosure Statement.

Dated: April 15, 2011

BARRIS, SOTT, DENN & DRIKER, P.L.L.C.

By: /s/ Todd R. Mendel
    Todd R. Mendel (P55447)
Attorneys for Honigman Miller Schwartz
and Cohn LLP
211 W. Fort Street, 15th Floor
Detroit, MI 48226-3281
(313) 965-9725
tmendel@bsdd.com

DICKINSON WRIGHT PLLC
By: James A. Plemmons
Attorneys for Honigman Miller Schwartz
and Cohn LLP
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3500
jplemmons@dickinsonwright.com

404460.02