# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **FN BUILDING L.L.C.,** | Case No. 11-46947 |
| | Hon. Marci B. McIvor |
| Debtor. | |

## FIRST AMENDED DISCLOSURE STATEMENT

THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO ALL CREDITORS AND PARTIES IN INTEREST OF FN BUILDING, L.L.C. ("**DEBTOR**"). THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY AFFECT CREDITORS' DECISIONS TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF REORGANIZATION. ALL CREDITORS ARE URGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY. ALL CAPITALIZED TERMS CONTAINED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE SAME MEANING AS CAPITALIZED TERMS CONTAINED IN THE PLAN OF REORGANIZATION ANNEXED TO THE DISCLOSURE STATEMENT AS EXHIBIT A.

COURT APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE COURT APPROVAL OF THE TERMS OF THE PLAN.

## INTRODUCTION

1.    The Debtor submits this First Amended Disclosure Statement ("Disclosure Statement") in connection with the solicitation of acceptances of its First Amended Plan of Reorganization ("Plan") under Chapter 11 of the United States Bankruptcy Code. A copy of the Plan is attached hereto as <u>Exhibit "A"</u>. All Creditors are urged to review the Plan, in addition to reviewing this Disclosure Statement. <u>All capitalized terms used but not defined herein shall have the meaning set forth in the Plan.</u>

2.    This Disclosure Statement is not intended to replace a review and analysis of the Plan. Rather, it is submitted as a review of the Plan in an effort to explain the terms and implications of the Plan. Every effort has been made to fully explain the various aspects of the Plan as it affects all Creditors. To the extent a Creditor has any questions, the Debtor urges you to contact its counsel and every effort will be made to assist you. THE DEBTOR URGES YOU TO VOTE IN FAVOR OF THE PLAN. THE DEBTOR'S GOAL IS FOR ALL CREDITOR CLASSES TO ACCEPT THE PLAN. IF ALL CREDITOR CLASSES DO NOT ACCEPT THE PLAN, THE DEBTOR INTENDS TO SEEK CRAMDOWN OF THE PLAN UNDER SECTION 1129(b) OF THE BANKRUPTCY CODE AS MAY BE NECESSARY TO EFFECT CONFIRMATION OF THE PLAN.

3.    On _____, 2011, after notice and a hearing, the Bankruptcy Court entered an order approving this Disclosure Statement as containing information of a kind and in

1

sufficient detail, as far as is reasonably practicable in light of the nature and history of the

Debtor and the condition of the Debtor's books and records, to enable Creditors whose votes are

being solicited to make an informed judgment whether to accept or reject the Plan.

       4.    Creditors should read this Disclosure Statement in its entirety prior to

voting on the Plan. No solicitation of votes may be made except pursuant to this Disclosure

Statement. EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT, NO

REPRESENTATIONS CONCERNING THE DEBTOR, ITS ASSETS, ITS PAST OR

FUTURE OPERATIONS, OR THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH

REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH

RESPECT TO THE PLAN. ANY REPRESENTATIONS MADE TO SECURE

ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS

DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE

DEBTOR.

       5.    THE INFORMATION CONTAINED IN THIS DISCLOSURE

STATEMENT HAS BEEN SUPPLIED BY THE DEBTOR. THE DEBTOR'S BOOKS AND

RECORDS HAVE BEEN USED TO PROVIDE THE INFORMATION CONCERNING THE

DEBTOR'S FINANCIAL CONDITION AS SET FORTH IN THIS DISCLOSURE

STATEMENT. BASED UPON THE INFORMATION MADE AVAILABLE, DEBTOR'S

COUNSEL HAS NO INFORMATION TO INDICATE THAT THE INFORMATION

DISCLOSED HEREIN IS INACCURATE. NEITHER THE DEBTOR NOR ITS COUNSEL,

2

HOWEVER, IS ABLE TO STATE DEFINITIVELY THAT THERE IS NO INACCURACY
HEREIN OR THAT FUTURE EVENTS MAY NOT RENDER THE INFORMATION
CONTAINED HEREIN INACCURATE.

6.     After reviewing this Disclosure Statement indicate your vote to accept or to
reject the Plan on the enclosed ballot, and return the ballot to counsel for the Debtor so as to be
received on or before June 21, 2011.

7.     The Bankruptcy Court has entered an Order fixing June 28, 2011, at 10:30
a.m., at the United States Bankruptcy Court, in Room 1875, 211 West Fort St, Detroit, MI
48226, as the date, time and place for the hearing on confirmation of the Plan, and fixing May
17, 2011, as the last date for the filing of any objections to confirmation of the Plan, and a date
of May 24, 2011, at 10:30 a.m. to hear objections to the Disclosure Statement.

3

## SUMMARY OF PLAN DISTRIBUTIONS

| Class | Treatment |
|---|---|
| Class 1: City of Detroit Liens totaling an estimated $462,398. | Payment in full in Cash of Allowed Amount on the Effective Date, plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment. |
| Class 2: Construction lien claims senior in priority to first mortgage. Michigan State Court orders exist deeming construction liens of E. Gilbert & Sons ($175,305 claimed by creditor) and Michielutti Bros. Inc. ($175,000 claimed by creditor) to be senior to the FNB Detroit First Mortgage. No such determination has been made with respect to the American Mechanical Inc. ($74,301 claimed by creditor) claim. | Payment in full in cash of Allowed Amount on the Effective Date, plus interest at the statutory rate as it accrues from the Petition Date. |
| Class 3: FNB Detroit First Mortgage in an amount in excess of $25,723,000. | Payment of available cash up to Allowed Amount of Class 3 Claims, after payment of administration claims and Class 1, Class 2 and Class 4 Claims, and after $100,000 carve-out for distribution to Class 5 general unsecured creditor claims to the extent necessary to ensure a $100,000 payment to Class 5 Claimants. |
| Class 4: Priority Claims. The Debtor is aware of no such claims. | Payment in full in Cash on the Effective Date, plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment. |
| Class 5: General Unsecured Claims in the amount of approximately $2,200,000 plus the amount of any First Mortgage deficiency claim which is estimated to be in excess of $17,000,000 for a total of approximately $19.2 million. The First Mortgagee and the insider general unsecured creditor have agreed to waive distribution on their claims, but not their right to vote on the Plan | Each Holder of a Class 5 Claim shall be paid its pro-rata share of the available cash after payment of administration claims and Class 1 through Class 4 Claims, provided, however, that the Class 3 Claimant has agreed to a $100,000 minimum distribution fund which will provide for an estimated distribution to general unsecured creditors of approximately 15% of the allowed amounts of their allowed claims. |
| Class 6: Equity Interests | The Class 6 Equity Holder shall be paid such amount as may be available, if any, after payment of the Class 1 through 6 Claims in full |

## BACKGROUND

8.    On January 26, 2011, the Debtor filed a Chapter 11 petition under Title 11 of

the United States Code, 11 U.S.C. §§101 et seq. (the "Bankruptcy Code")

4

9.      The Debtor owns a parcel of real property located at 660 Woodward Avenue, Detroit, Michigan (the "Property"). The Property is a 25 story landmark office building, with a number of retail tenants, and a 560 space parking garage, located on a one acre site in downtown Detroit.

10.      The Property has a $5,575,000 value as of July 2009 pursuant to an appraisal prepared at that time.

11.      The Property is encumbered by Wayne County real estate tax liens in the amount of approximately $462,398.

12.      FNB Detroit 2010 LLC (the "Lender" or the "Mortgagee") asserts a first mortgage claim in the amount of $25,723,000. The Lender purchased the underlying note and mortgage from PNC Bank in November 2010 to help the Debtor resolve the biggest obstacle to the Debtor's rehabilitation.

13.      In addition, the Property is encumbered by claims made by various construction lienors in the aggregate amount of approximately $350,000.

14.      The Debtor's general unsecured creditors have claims totaling approximately $2,200,000. Approximately $1.6 million of this amount represents loans made by Zul Capital

LLC, an affiliate, to improve the Property. The law firm of Honigman Miller Schwartz and Cohn, LLP, ("Honigman") has an unliquidated and disputed claim.

15. The Debtor's financial problems arise from the economic downturn which inhibited the Debtor's ability to keep up with the mortgage and upkeep of the Property, followed by severe water damage to the Property. The acquisition of the mortgage by the Lender, an entity working closely with the Debtor, was the first step towards freeing up cash flow to preserve, protect and improve the Property, so that ultimately the Property could be sold. The Debtor filed this petition to further advance that goal by centralizing and resolving, or at least defusing, claims that are being asserted in several lawsuits in several different forums.

16. For example, at the time that FNB Detroit acquired the note and mortgage, the Property was subject to a foreclosure proceeding and the Receiver operating the Property for more than a year. The foreclosure process, however, is a cumbersome legal proceeding, at best.

17. The continuation of the receivership resulted from the intervention of Honigman the Debtor's largest tenant, occupying four floors of the Property. The exhibits to the Receiver's motion indicate that Honigman's primary concern was that a reversion of management to the Debtor would lead to mismanagement, harm to the Property and harm to Honigman, as tenant.

6

18.     Since the filing this petition, the Debtor's has agreed to take all reasonable steps to resolve each of Honigman's concerns. In that regard, the Debtor agreed to continue employ the Receiver's managing agent, (which entity was actually appointed to be receiver by the State Court before the Receiver assumed that title). In addition, the Debtor agreed to allow the receiver to adhere to an agreed upon budget for the Property, absent an order of the Bankruptcy Court on notice to parties in interest including Honigman. Significantly, the Mortgagee agreed that it would not demand adequate protection payments, again absent an order of the Bankruptcy Court. And ultimately, the Debtor even agreed to continue the Receiver in possession on an interim basis.

19.     **The Debtor's goal is to sell the Property located at 660 Woodward, Detrooit, Mi 48226. Since filing the case, the Debtor and the Mortgagee have entered into a Purchase Agreement, attached hereto Exhibit A, to a purchaser represented by Honigman, for a purchase price of $8,125,000 to be paid at closing. The Purchase Agreement has strict deadlines for various conditions to be satisfied in the bankruptcy proceedings. The failure to accomplish any of these conditions in a timely manner could result in the termination of the Purchase Agreement by the Purchaser. For example, Paragraph 9 of the Purchase Agreement requires that an order confirming the Plan of Reorganization must be entered no later than 60 days after the "Effective Date" which has been determined to be April 13, 2011. Accordingly, any objections to this Disclosure Statement or to confirmation of the Plan of Reorganization could result in delays which would give the Purchaser grounds to terminate the Purchase Agreement.**

7

In that regard, Honigman and United Way of Southeastern Michigan ("United Way") have requested the inclusion of language in the Disclosure Statement which the Debtor deems to be disparaging to individuals associated with the Debtor and in no way providing useful information to assist the creditors in making an informed decision on whether to vote for or against the Plan. Moreover, Honigman has indicated it is imperative to take the depositions of a number unavailable individuals situated in New York and Israel prior to the confirmation of the Plan of Reorganization. It is Debtor's belief that if Honigman and United Way press forward with their demands for language in the Disclosure Statement which the Debtor deems unuseful to creditors, and proceeds to press for depositions of individuals who are out of the State of Michigan or out of the country and obviously unavailable, the Plan of Reorganization will not be timely confirmed and the Purchase Agreement will be terminated by the Purchaser according to its terms.

20.     It is that sale which the Debtor proposes to be the foundation for a Chapter 11 plan. In the event that the sale cannot be effectuated, the Debtor proposes to sell the property pursuant such terms as may be approved by the Bankruptcy Court.

21.     It is almost certain that no sale will generate sale proceeds sufficient to pay the Mortgagee in full. Accordingly, the Mortgagee has agreed to carve out $100,000 from the sale proceeds for payment to general unsecured creditors. In order to make that a meaningful distribution, the insider general unsecured creditor with a claim of approximately $1,589,000 has agreed to waive distribution as a general unsecured creditor, and the mortgagee has similarly

8

agreed to waive distribution on its deficiency claim which is estimated to be about $17,000,000. This leaves approximately $600,000 of general unsecured claims. A $100,000 distribution fund, therefore, will result in pro-rata distribution to Class 5 General Unsecured Creditors of approximately 15%.

22.    INFORMATION SUBMITTED PURSUANT TO JUDGE McIVOR'S DISCLOSURE STATEMENT REQUIREMENTS

(1)    The Debtor: The Debtor is a Delaware business entity. The Debtor will not continue its business following the liquidation of its assets.

(2)    Principals of the Debtor: the sole principal and 100% owner of the of the Debtor is Skyloft, LP, a Delaware business entity. Skyloft, LP, currently receives no distributions from the Debtor and will not be receiving any in the future.

(3)    Post petition events of significance: There were no transfers outside the ordinary course of business. The Debtor does not receive and has no control over cash. All cash is collected by and disbursed by O'Keefe & Associates Consulting, LLC, a receiver appointed by the Wayne County Circuit Court. On March 30, 2011, the Bankruptcy Court signed a final Order approving the use of cash collateral. 2. Notwithstanding any other provision herein, the right to use Cash Collateral terminates on the earlier of (a) the "Effective Date" of any confirmed Chapter 11 Plan in this case, (b) the effective date of

9

closing on a sale of the Building, or (c) July 31, 2011. There was no litigation during the bankruptcy case.

(4)  <u>Assets and Liabilities:</u> the assets and liabilities and a liquidation analysis are described elsewhere in this Disclosure Statement. The Debtor is unaware of any potential claims or causes of action including claims against insiders. Priority claims and non-priority unsecured claims are described elsewhere in this Disclosure Statement. None of the debts of the Debtor are guaranteed.

(5)  <u>Details regarding implementation of the Plan:</u> Details regarding implementation of the Plan are described elsewhere in this Disclosure Statement.

DEBTOR'S PLAN OF REORGANIZATION

<u>CLASSIFICATION AND TREATMENT OF CLAIMS</u>

<u>Class 1: City of Detroit Secured Claims</u>

23.  <u>Classification</u> – Class 1 consists of the pre-petition City of Detroit liens for unpaid real estate taxes and related charges. Such claims total approximately $462,398.

10

24.    Treatment -- The holder of the Class 1 Claim shall be paid in full in Cash on the Effective Date, plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

25.    Voting -- The Holder of the Class 1 Claim is unimpaired and is deemed to have accepted the Plan.

### Class 2: Construction Liens

Classification – Class 2 consists of the construction lien claims senior in priority to the first Mortgage. Michigan State Court orders exist deeming construction liens of E. Gilbert & Sons ($175,305 claimed by creditor) and Michielutti Bros. Inc. ($175,000 claimed by creditor) to be senior to the FNB Debtroit First Mortgage. No such determination has been made with respect to the American Mechanical Inc. ($74,301 claimed by creditor) claim.

26.    Treatment – Payment in full in cash of Allowed Amount on the Effective Date, plus interest at the statutory rate as it accrues from the Petition Date.

27.    Voting – The Holder of the Class 2 Claim is unimpaired and is deemed to have accepted the Plan.

11

## Class 3: First Mortgage

28.    <u>Classification</u> – Class 3 consists of the Claim of FNB Detroit First Mortgage in an amount in excess of $25,723,000.

29.    <u>Treatment</u> – Payment of available cash up to the Allowed Amount of the Class 3 Claim, after payment of administration claims and Class 1, Class 2 and Class 4 Claims, and after $100,000 carve-out for distribution to Class 5 general unsecured creditor claims to the extent necessary to ensure a $100,000 payment to Class 5 Claimants.

30.    <u>Voting</u> – The Holder of the Class 3 Claim is impaired and is entitled to vote to accept or reject the Plan.

## Class 4: Priority Claims

31.    <u>Classification</u> – Class 4 consists of Allowed Priority Claims under Sections 507(a)(2),(3),(4),(5),(6),(7),and (8) of the Bankruptcy Code.  The Debtor is aware of no Class 4 Claims.

32.    <u>Treatment</u> – Holders of Class 4 Claims shall be paid in full in Cash plus interest at the applicable legal rate on the Effective Date.

12

33. <u>Voting</u> – Holders of Class 4 Claims are unimpaired and are deemed to have accepted the Plan.

### Class 5: Unsecured Claims

34. <u>Classification</u> – Class 5 consists of Allowed Unsecured Claims. The Debtor estimates general unsecured claims totaling $2,200,000 plus the amount of any First Mortgage deficiency claim which is estimated to be in excess of $17,000,000 for a total of approximately $19.2 million. The First Mortgagee and the insider general unsecured creditor have agreed to waive distribution on their claims, but not their right to vote on the Plan

35. <u>Treatment</u> – Each Holder of a Class 5 Claim shall be paid its pro-rata share of the available cash after payment of administration claims and Class 1 through Class 4 Claims, provided, however, that the Class 3 Claimant has agreed to a $100,000 minimum distribution fund which will provide for an estimated distribution to general unsecured creditors of approximately 15% of the allowed amounts of their allowed claims.

36. <u>Voting</u> – Holders of the Class 5 Claims are impaired and are entitled to vote to accept or reject the Plan.

13

## Class 6: Equity Holders

37.    <u>Classification</u> – Class 6 consists of Skyloft, LP, the Debtor's sole equity member.

38.    <u>Treatment</u> – The Class 6 Equity Holder shall be paid such amount as may be available after payment of the Class 1 through 5 Claims.

39.    <u>Voting</u> – The Holder of Class 6 Equity Interests is impaired and is entitled to vote to accept or reject the Plan.

## ADMINISTRATIVE EXPENSES

40.    Allowed Administrative Expenses shall be paid in full, in cash on the Effective Date, or the date such Administrative Expense becomes Allowed or as soon as practicable thereafter, except to the extent that the holder of an Allowed Administrative Expense agrees to a different treatment; <u>provided</u>, <u>however</u>, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business or assumed by the Debtor shall be paid in full or performed by the Debtor in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.

14

41.     All outstanding United States Trustee fees will paid as they come due,

provided however, that all outstanding United States Trustee fees due at the time of sale, or

triggered by the distribution of sale proceeds, shall be paid from the sale proceeds.

## MEANS FOR IMPLEMENTATION OF THE PLAN

42.     The Debtor shall take all necessary steps, and perform all necessary acts, to

consummate the terms and conditions of the Plan, including, without limitation, transferring the

Property to the Purchaser as provided for in the contract annexed to the Plan as Exhibit A. As

set forth more fully in the purchase agreement, the Plan proposes a private sale to the Purchaser

for an $8,3750,000 purchase price. The transfer of the Property under the Plan shall be free and

clear of all liens, claims and encumbrances, with any such liens, claims and encumbrances to

attach to the Sale Proceeds, and to be disbursed under the Plan. In addition, the Debtor shall

distribute the remaining funds in the Receiver's account after the Receiver has completed his

accounting and made all of his disbursements.

43.     In the event that the proposed private sale fails to close, then the Debtor

proposes to sell the property according to terms as may be approved by the Bankruptcy Court.

44.     The Debtor has determined to proceed by way of a private sale in the first

instance for the following reasons: (a) the purchase price is acceptable to the Mortgagee, who

would enjoy the benefit of any higher offer, thereby indicating that the purchase price is fair, (b)

15

the distribution to general unsecured creditors is unlikely to be improved by a sale to any other

purchaser since (i) the Mortgagee has agreed to carve out $100,000 of distributions that it would

otherwise be entitled to, the Mortgagee and the insider creditor have agreed to waive payment on

their unsecured claims, which would otherwise be entitled to virtually all of distributions to

general unsecured creditors, and (d) the Mortgagee has agreed to provide the enhanced

distributions conditioned upon an early sale and plan confirmation process, which is essential to

the preservation of the value of the Property.

45.     In such unique circumstance as exist here, case law supports a private sale.

Indeed, as a general rule, when the sale of estate property under the Bankruptcy Code is

proposed, "the trustee has ample discretion to administer the estate, including authority to

conduct public or private sales of estate property." In re WPRV-TV, Inc., 143 B.R. 315, 319

(D.P.R. 1991), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992), aff'd in part, rev'd in part,

983 F.2d 336 (1st Cir. 1993). Accord, In re Canyon Partnership, 55 B.R. 520, 524 (Bankr. S.D.

Cal. 1985); see, e.g., In re Jewel Terrace Corp., 10 B.R. 1008 (E.D.N.Y. 1981) (affirming

Bankruptcy Court decision authorizing and approving private sale of debtor's real estate as the

most advantageous arrangement for both the creditors and debtor, and dismissing appeal).

46.     In re Vanguard Oil & Service Co., Inc., 88 B.R. 576 (E.D.N.Y.,1988) is

especially instructive. In Vanguard, as in this case, the bankruptcy estate was offered a premium

for the purchase of certain property over the value of that property conditioned upon immediate

16

acceptance. The Bankruptcy Court approved the application, and the District Court affirmed,

citing Second Circuit authority, as follows:

> Although appellant alleges various due process violations, appellant fails to
> demonstrate how it was materially prejudiced. In its motion papers, Apex admits to
> having had notice in fact by the Bankruptcy Court's actions. Furthermore, in Matter of
> General Insecticide Co., Inc. v. Bankrupt, 403 F.2d 629 (2d Cir.1968), the Second
> Circuit held that absence of notice to the creditors of a private sale was not a sufficient
> ground for setting aside a bankruptcy sale. There, the Court found that if an
> advantageous sale would be lost or if the property to be sold would substantially
> depreciate in value during the notice period, the notice requirement for a private sale
> from a bankrupt estate could be dispensed with. Id. at 630. In the present case, due to
> the seasonal nature of the Debtor's business, Bayside conditioned its offer upon
> immediate acceptance. A delay in accepting Bayside's offer arguably risked decreasing
> the value of all the assets involved in the Debtor's estate. Therefore, in approving the
> sale of the real property despite appellant's objection to improper notice, the
> Bankruptcy Court acted within its discretion as enunciated in General Insecticide.
> Apex had an opportunity to contest the sale or bid, yet it appeared at the sale and failed
> to object. For the foregoing reasons, we find Apex's due process claim unpersuasive.

88 B.R. 580

47.     Although the Vanguard Oil Court approved the subject sale notwithstanding

the absence of notice, in this case, the Plan process provides for notice and an opportunity to be

heard to all parties in interest. Thus, approval of a private sale in this case is even more

compelling than in certain of the reported cases cited herein.

48.     As part of the sale under the Plan, and in order to ensure consummation of

the Plan, the Plan requires that the Confirmation Order contain the language forth in Paragraph

9 of the attached Purchase Agreement.

17

49.     In order to facilitate the sale to the Purchaser free and clear of all liens claims and encumbrances, on the Effective Date, except as otherwise provided in the Plan, and/or the purchase agreement and the Confirmation Order, and concurrent with payment on the Effective Date, the Plan provides that: (a) each holder of a Secured Claim, shall on the Effective Date (x) turn over and release to the Reorganized Debtor any and all Collateral that secures or purportedly secures such Claim, as they pertain to the properties currently owned by the Debtor or such Lien shall automatically, and without further action by the Debtor or the Reorganized Debtor, be deemed released, and (y) execute such documents and instruments as the Reorganized Debtor requests to evidence such Claim holder's release of such property or Lien.

50.     Under the Plan, pursuant to Bankruptcy Code § 1146(c), (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Property by the Purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject any applicable document

18

recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or governmental assessment.

51.     Except as otherwise provided herein, on the Effective Date all assets and properties of the Estate shall vest in the Debtor free and clear of all Liens, Claims and encumbrances and any and all liens, claims and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished as of such date. Except as otherwise provided herein, as of the Effective Date, all property of the Debtor shall be free and clear of all Claims and Interests of Creditors, except for the obligations that are imposed under the Plan or by a Final Order of the Bankruptcy Court.

52.     The Debtor shall be authorized to execute, in the name of any necessary party, any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

53.     Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transaction contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved by the Plan, and the Confirmation Order.

19

54.     On the Effective Date, the receivership shall be deemed concluded and terminated and any and all interests and rights in and to all property, held by or entitled to be received by the Receiver, shall be transferred to the Debtor after payment or a reserve to be held by the Receiver for all outstanding debts and obligations incurred by the Receiver prior to closing. As soon as practicable Effective Date, the Receiver shall provide the Debtor with a final accounting as to all sums collected by the Receiver during the receivership and the application thereof. The foregoing, the Receiver shall be entitled to hold back from turnover to the Debtor, the claimed amount of receivership fees and expenses, including legal fees, pending approval of such fees by the Bankruptcy Court.

## LIQUIDATION ANALYSIS

55.     In a liquidation under Chapter 7 of the Bankruptcy Code, the Debtor's assets would sold and the sale proceeds distributed to creditors in their order of priority. The Debtor believes that the Plan provides a far better return for the Debtor's estate than could be achieved in a liquidation. Indeed, as set forth on Exhibit B hereto, the Debtor projects that in a Chapter 7 liquidation, general unsecured creditors would receive no distribution.

56.     Under the Plan, the Mortgagee has agreed to cause $100,000 of the sale proceeds that would otherwise be attributable to Secured Claims, and its right to any distribution as an unsecured creditor. Distribution to insider unsecured claims is being waived as well. In total, the Purchaser and the insiders are waiving distribution on claims representing more than

20

95% of general unsecured claims, in order to enhance distributions to non-insider general unsecured creditors under the Plan. It would be extremely unlikely that a Chapter 7 Trustee could achieve such a result.

57. Finally, a Chapter 7 Trustee represents an additional layer of administration legal expenses and commissions, which the Debtor estimates would total 5% of the sale proceeds.

## LITIGATION ANALYSIS

58. Arbitration is pending concerning the claim of tenant Honigman Miller Schwartz & Cohn LLP to terminate its lease. That arbitration will continue post-confirmation. A foreclosure action interposed by the Mortgagee is pending as well. It will be discontinued upon plan confirmation. The Receiver has interposed various landlord tenant actions which will continue post-confirmation.

## PAYMENT OF CLAIMS AND OBJECTIONS TO CLAIMS

59. The Debtor shall be disbursing agent under the Plan. The Debtor has not completed its claims review and reserves its right to file objections to claims in the event grounds exist to object to particular claims. The Debtor may file objections to Claims for a period of 120 days after the Effective Date.

60.     On the initial distribution date and on each distribution date as may thereafter be necessary, the Debtor shall maintain an undetermined claims distribution reserve for the holders of undetermined claims as of such date in a sum not less than the amount required to pay each such undetermined claim if such claim was allowed in full. To the extent that an undetermined claim becomes an Allowed Claim, the distributions reserved for such Allowed Claim, shall be released from the undetermined claims distribution reserve and paid to the holder of such Allowed Claim. After all the amounts of all undetermined claims have been fixed, the balance of the undetermined claims distribution reserve shall thereafter be paid in accordance with the Plan.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

61.     Pursuant to the terms of Paragraph 8 of the Purchase Agreement (Exhibit A), the Purchaser has the right, with certain limitations, at any time prior to the conclusion of the Confirmation Hearing to designate which executory agreements and unexpired leases will be assumed or rejected.    As of this date, the Purchaser has directed that all leases will be assumed.

62.     Assumption or rejection of executory contracts and unexpired leases shall be governed by procedures to be approved by the Court. All Allowed Claims arising from the rejection of any Executory Contract shall be treated as an Unsecured Claim.

22

63.     Any Claim arising from the rejection of any Executory Contract not filed

with the Court within the time period provided in the preceding paragraph above shall be

deemed discharged and shall not be entitled to participate in any distribution under the Plan.

## MANAGEMENT OF THE DEBTOR

64.     The building owed by the Debtor at 660 Woodward, Detroit, Michigan, is

managed by Finsilver/Friedman Management Corporation who was selected by O'Keefe &

Associates Consulting, LLC, a Receiver appointed by the Wayne County Circuit Court. That

receivership shall continue until the building is sold.

## TAX CONSEQUENCES

65.     The Debtor does not believe that there will be any negative tax consequences

to the Debtor or to Creditors under the Plan. To the extent that a creditor is not paid in full

under the Plan, such creditor may be entitled to a bad debt deduction.

66.     THE DEBTOR DOES NOT PURPORT, THROUGH THIS DISCLOSURE

STATEMENT, TO ADVISE THE CREDITORS OR INTEREST HOLDERS REGARDING

THE TAX CONSEQUENCES OF THE TREATMENT OF THE CREDITORS AND

INTEREST HOLDERS UNDER THE PLAN. CREDITORS AND INTEREST HOLDERS

SHOULD SEEK INDEPENDENT COUNSEL CONCERNING THE TAX CONSEQUENCES

OF THEIR TREATMENT UNDER THE PLAN.

23

## 67.  VOTING PROCEDURES AND REQUIREMENTS

### A. Voting procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interest, that are impaired under the plan. Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the plan.

Creditors that hold claims in more than one impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan and disclosure statement, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the debtor's attorney by the deadline previously established by the court.

24

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.

A ballot that is not received by the deadline will not be counted. If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the debtor's attorney.

## B. Acceptance

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

## C. Confirmation

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a plan. These conditions5 are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process. Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are these:

1. Each class of impaired creditors and interest must accept the plan, as described in paragraph VI.B., above.

2. <u>Either</u> each holder of a claim or interest in a class must accept the plan, or the plan

25

must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

## D. Modification

The debtor reserves the right to modify or withdraw the plan at any time before confirmation.

## E. Effect of confirmation

If the plan is confirmed by the Court:

1. Its terms are binding on the debtor, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the plan.

2. Except as provided in the plan:

   (a)   In the case of a corporation that is reorganizing and continuing business:

      (1)   All claims and interests will be discharged.

      (2)   Creditors and shareholders will be prohibited from asserting their claims against or interest in the debtor or its assets.

   (b)   In the case of a corporation that is liquidating and not continuing its business:

      (1)   Claims and interests will not be discharged.

      (2)   Creditors and shareholders will not be prohibited from asserting their claims against or interests in the debtor or its assets.

26

A ballot to be used for voting to accept or reject the Plan is enclosed with this Disclosure Statement. Each creditor is entitled to execute the ballot, and return it to the undersigned to be considered for voting purposes. The Bankruptcy Court has directed that, in order to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received no later than June 21, 2011, at the following address:

> Martin L. Fried
> 4000 Town Center, Ste 1200
> Southfield, MI 48075.

68.     Each Creditor of the Debtor whose Claim is impaired under the Plan is entitled to vote, if either (i) its Claim has been scheduled by the Debtor, or (ii) it has filed a Proof of Claim on or before June 24, 2011, the last date set by the Bankruptcy Court for such filings.

69.     Class 3, and 5 Creditors are impaired under the Plan and are eligible, subject to the limitations set forth above, to vote to accept or reject the Plan.

70.     Any Claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the Claim in an amount which it deems proper for the purpose of accepting or rejecting the Plan upon motion by a Creditor whose Claim is subject to an objection. Such motion must be heard and

27

determined by the Bankruptcy Court prior to the date established by the Court to confirm the Plan.

71.     A Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

72.     The Bankruptcy Code defines acceptance of a Plan by a class of Creditors as acceptance by holders of two-thirds in dollar amount and a majority in number of the Claims of that class which actually cast ballots for acceptance or rejection of the Plan, i.e., acceptance takes place only if two-thirds in amount and a majority in number of the Creditors actually voting cast their ballots in favor of acceptance.

73.     The Bankruptcy Code defines acceptance of a Plan by a class of Interests as acceptance by holders of two-thirds in amount of the allowed Interests of such class held by holders of such interests.

CONFIRMATION OF THE PLAN

74.     Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) provides that any party in interest may object to confirmation of the Plan.

28

75.     By order of the Bankruptcy Court dated April 7, 2011, the Confirmation

Hearing has been scheduled for June 28, 2011, at 10:30 a.m., Judge McIvor's Courtroom, Room

1875, United States Bankruptcy Court, 211 West Fort, Detroit, MI 48226. The Confirmation

Hearing may be adjourned from time to time by the Bankruptcy Court without further notice

except for an announcement made at the Confirmation Hearing or any adjourned Confirmation

Hearing. Any objection to confirmation of the Plan must be made in writing and filed with the

Bankruptcy Court with proof of service and served upon the following on or before June 21,

2011:

> Martin L. Fried
> 4000 Town Center, Ste 1200
> Southfield, MI 48075.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.


76.     At the Confirmation Hearing, the Bankruptcy Court will determine whether

the requirements of Section 1129 of the Bankruptcy Code have been satisfied to enter an order

confirming the Plan. The applicable requirements are as follows: (a) The Plan complies with

the applicable provisions of the Bankruptcy Code, (b) the Debtor has complied with the

applicable provisions of the Bankruptcy Code; (c) the Plan has been proposed in good faith and

not by any means forbidden by law, (d) any payment made or promised or by a person issuing

securities or acquiring property under the Plan, for services or for costs and expenses in, or in

connection with, the Bankruptcy Case, or in connection with the Plan and incident to the

Bankruptcy Case, has been disclosed to the Bankruptcy Court, and any such payment made

29

before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable, (e) the Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a Plan with the Debtor, or a successor to the Debtor under the Plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of Creditors and equity security holders and with public policy, and the Debtor has disclosed the identity of any insider that will be employed or retained by the reorganized Debtor, and the nature of any compensation for such insider, (f) with respect to each class of impaired Claims, either each holder of a Claim or interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or interest property of a value, as of the Effective Date of the Plan, an amount that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code, (g) each class of Claims or interests has either accepted the Plan or is not impaired under the Plan, (h) except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expenses and priority Claims will be paid in full on the Effective Date, (i) at least one class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such class, and (j) confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successors to the Debtor under the Plan unless such liquidation or reorganization is proposed in the Plan.

30

77.     The Debtor believes that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of Chapter 11, and that the proposals contained in the Plan are made in good faith.

78.     The Debtor contends that holders of all Claims impaired under the Plan will receive payments under the Plan having a present value as of the Effective Date in amounts not less than the amounts likely to be received if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

## CRAMDOWN

79.     In the event that any impaired class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each impaired class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."

THE DEBTOR INTENDS TO INVOKE THE CRAMDOWN PROVISIONS OF SECTION 1129(b) AS TO ANY IMPAIRED CLASS THAT DOES NOT ACCEPT THE PLAN.

31

80.     A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives less than it is legally entitled to receive for its Claims or equity interests. "Fair and equitable" has different meanings for Secured and Unsecured Claims.

81.     With respect to a Secured Claim, "fair and equitable" means either:

(a)     the impaired Secured Creditor retains its Liens to the extent of its Allowed Claim and receives deferred cash payments at least equal to the allowed amount of its Claim with a present value as of the Effective Date at least equal to the value of such Creditor's interest in the property securing its Liens;

(b)     property subject to the Lien of the impaired Secured Creditor is sold free and clear of that Lien, with that Lien attaching to the proceeds of the sale; or

(c)     the impaired Secured Creditor realizes the "indubitable equivalent" of its Claim under the Plan.

82.     With respect to an Unsecured Claim, "fair and equitable" means either:

(a)     each impaired Unsecured Creditor receives or retains property of a value equal to the amount of its Allowed Claim; or

(b)     the holders of Claims and Interests that are junior to the Claims of the dissenting class will not receive any property under the Plan.

83.     In the event one or more classes of impaired Claims rejects the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of Claims.

32

33

## CONCLUSION

The Debtor urges the Debtor's Creditors to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than June 21, 2011

Dated:          April 26, 2011

                        DEBTOR:

                        /s/ Skyloft, LP, by Cesare Lorenzo,
                        its Managing Member

                        _____
                        By Skyloft, LP, by Cesare Lorenzo
                        its Managing Member

                 Respectfully submitted

                 GOLDSTEIN BERSHAD & FRIED, PC

                 BY: /s/ Martin L. Fried
                     Martin L. Fried P13712
                     Attorney for Debtor
                     4000 Town Center, Suite 1200
                     Southfield, MI 48075
                     (248) 355-5300
                     (248) 355-4644-fax
                     Marty@bk-lawyer.net

34

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of the 4th day of April 2011 (the "**Execution Date**") between **FN BUILDING, LLC**, a Delaware limited liability company, whose address is c/o Northern Group, Inc., 575 Lexington Avenue, Suite 3200, New York, New York 10022 ("**Seller**" and a "**party**"), and **660 WOODWARD ASSOCIATES LLC**, a Michigan limited liability company, whose address is 38500 Woodward Avenue, Suite 100, Bloomfield Hills, Michigan 48304 ("**Purchaser**" and a "**party**"). The effective date of this Agreement shall be the earlier to occur of: (a) April 29, 2011; and (b) the date upon which Seller delivers to Purchaser all Exhibits to this Agreement, as specified in this Agreement (the "**Effective Date**").

A.     Seller is the owner of certain real property located in the City of Detroit, County of Wayne, State of Michigan, as more particularly described on **Exhibit A** attached to and made a part of this Agreement, together with all air rights and all right, title and interest of Seller in and to any land lying in the bed of any highway, street, road or avenue, opened or proposed, in front of or abutting or adjoining such tract or piece of land and any easements, tenements, hereditaments, and appurtenances pertaining thereto and all the buildings and other improvements located thereon, together with all easements, air, mineral and riparian rights and all tenements, hereditaments, privileges and appurtenances thereto belonging or in any way appertaining thereto (the "**Real Property**"); all fixtures, equipment and personalty owned by Seller and located on or about the Real Property or used in conjunction therewith, including, but not limited to, any and all landscaping equipment, vehicles, furniture and furnishings and all heating, lighting, plumbing, electrical and air conditioning fixtures and equipment, hot water heaters, carpeting, appliances, furnaces, heating controls, motors, boiler pressure systems and equipment, rest room fixtures, shelving, partitioning, ventilating, incinerating, disposal, cleaning, snow removal and fire sprinkling system equipment, office equipment and furniture, vending, video and/or amusement machines, fuel, and other supplies and disposables, if any, excluding there from only personalty which is owned by tenants of the Real Property (the "**Personal Property**") (the Real Property and the Personal Property are hereinafter collectively referred to as the "**Property**"). The Property shall also include all tangible and intangible personal property owned by Seller located on or about or arising out of the ownership of the Real Property (excluding any cash on hand or in bank accounts as of the Closing (as defined below)) and any pending or future award made payable to Seller in condemnation or to be made in lieu thereof, and any unpaid award for damage to the Real Property; all appurtenant easements, whether or not of record, strips and rights of way abutting, adjacent, contiguous, or adjoining the Real Property; the trade name by which the Property is commonly known or any other name by which the improvements on the Real Property are commonly known, including, but not limited to, the name "First National Building"; to the extent assignable, all licenses, permits and franchises issued by any State, Federal and local municipal authorities relating to the use, maintenance and operation of the Property; to the extent transferable, all plans and specifications relating to the

8963312.3

# EXHIBIT A

construction of any improvements on the Real Property and all unexpired claims, warranties, guaranties and sureties received by, Seller in connection with the construction, improvement or equipment of or on the Property; the executory contracts listed on **Exhibit B** attached to and made a part of this Agreement (collectively, the "**Assumed Contracts**"); the unexpired leases identified on the rent roll (the "**Rent Roll**") as listed on **Exhibit C** attached to and made a part of this Agreement (collectively, the "**Assumed Leases**"); and all monthly parking licenses and rights to use or occupy all or any portion of the Property as listed on **Exhibit D** attached to and made a part of this Agreement (the "**Parking Licenses**"). The Assumed Contracts, the Assumed Leases and the Parking Licenses are collectively referred to as the "**Assumed Agreements**." For the avoidance of doubt, to the extent that any executory contract or unexpired lease of Seller is not an Assumed Agreement specifically listed on attached **Exhibit B**, **Exhibit C** or **Exhibit D**, respectively, it shall not be assigned to Purchaser and Purchaser shall have no liability therefor.

B.    Seller is the Debtor in Chapter 11 bankruptcy case no. 11-46947 (the "**Bankruptcy Case**") which is pending in the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division (the "**Bankruptcy Court**").

C.    Seller desires to sell to Purchaser and Purchaser desires to purchase from Seller the Property upon and subject to the terms and conditions set forth below.

Now, therefore, in consideration of the mutual covenants, promises, and agreements and subject to the terms and conditions contained herein, the parties agree as follows:

1.    **Certain Definitions.**

"**Bankruptcy Code**" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended.

"**Business Day**" means any day, other than a Saturday, Sunday or legal holiday, or any day on which banks are closed for business in Detroit, Michigan.

"**Claim**" means a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"**Cure Costs**" means all amounts payable in order to cure all monetary and non-monetary defaults, liabilities and Claims required to be paid under Section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by Seller and assignment to Purchaser of each of the Assumed Agreements.

"**Encumbrances**" means any: Claim; community property interest; condition; equitable interest; lien of any kind or nature including, without limitation, mechanic's lien, materialman's lien, laborer's lien, tax lien, judgment lien, and construction lien (statutory or otherwise); license; option; mortgage; pledge;

encumbrance; easement; covenant; right of way or similar restrictions; security interest of any kind or nature; restriction under any applicable bulk sales law; right of first refusal or restriction of any kind or nature, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership, and including easements, covenants, rights of way and other similar restrictions, mortgage, pledge, security interest, encumbrance, tax, charge of any kind (including, without limitation, any conditional sale or other title retention agreement or lease in the nature thereof); any sale of receivables with recourse against Seller; and any filing or agreement to file a financing statement as debtor under the Uniform Commercial Code or any similar statute (other than the Permitted Exceptions).

"**Plan Effective Date**" means the date on which all conditions to effectiveness of Seller's Plan of Reorganization in the Bankruptcy Case have been satisfied or waived and the transactions contemplated by the Plan of Reorganization are consummated.

"**Final Order**" means an order of the Bankruptcy Court as to which the time to appeal, petition for *certiorari* or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, reargue or rehear shall have been waived in writing in form and substance satisfactory to the parties hereto or, in the event that an appeal, writ of *certiorari* or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari* or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed with respect to such order shall not preclude such order from being a Bankruptcy Final Order.

2.     **Agreement of Sale and Purchase.** Seller agrees to sell the Property and assign the Assumed Agreements (as defined below) to Purchaser, and Purchaser agrees to purchase the Property and accept the assignment of the Assumed Agreements from Seller, upon and subject to the terms and conditions in this Agreement, free and clear of all Encumbrances.

3.     **Purchase Price.** The purchase price of the Property (the "**Purchase Price**") shall be EIGHT MILLION ONE HUNDRED AND TWENTY-FIVE THOUSAND AND 00/100 DOLLARS ($8,125,000.00), plus all amounts to be paid by Purchaser pursuant to the provisions of Section 8 of this Agreement.

4.     **Deposit.**

(a)     Within one (1) business day after the Effective Date, Purchaser shall deliver to the Title Company an earnest money deposit in the total amount of One Hundred Thousand and 00/100 Dollars ($100,000.00) (the "**Deposit**"), which Deposit

8963312.3

3

shall be held in escrow by the Title Company in an interest bearing account to be disbursed in accordance with the provisions of this Agreement.

(b)    The Deposit shall be applied against that portion of the Purchase Price due upon the Closing or, except as otherwise expressly provided herein, Purchaser, at its option, may terminate this Agreement if the transactions contemplated by this Agreement do not close by the date which is 120 days from the Effective Date, at which time Purchaser shall receive a full refund of the Deposit, together with all accrued interest thereon.

(c)    In the event that this Agreement is terminated in accordance with Section 22, the Deposit, together with all accrued interest thereon, will be immediately refunded to Purchaser.

5.    **Evidence of Title.**  As evidence of title to the Property, Purchaser at its sole cost and expense shall obtain a commitment for a policy of title insurance (the "**Title Insurance Commitment**") (including complete legible copies of all documents referred to therein) issued by Title Source, Inc. (the "**Title Company**" and "**Escrow Agent**").  At the Closing, Purchaser shall, at Seller's sole expense, cause the Title Company to deliver to Purchaser a marked-up copy of the Title Insurance Commitment identifying Purchaser as the owner of the Property.  Neither Seller nor Purchaser shall do anything to cause a change in the title to the Property from the date of this Agreement through the date of Closing.  Seller shall be responsible for the cost of any endorsements to the Title Policy. Seller at its sole cost and expense shall cause the Title Company to omit each of the so called "Standard Exceptions" from Purchaser's Title Insurance Policy.

6.    **Survey**.  Within ten (10) days after the Effective Date, Seller shall deliver to Purchaser a copy of any survey in Seller's possession ("**Survey**").  Seller shall have no responsibility or liability to update or have the survey recertified.

7.    **Title Objections.**

(a)    The Property is sold and shall be conveyed to Purchaser free and clear of all Encumbrances, subject only to the matters set forth on **Exhibit E** (collectively, the "**Permitted Exceptions**"):

(b)    Purchaser agrees that no later than 5:00 p.m. Eastern Daylight Time on the date that is fifteen (15) days after the Effective Date (the "**Title Report Objection Date**"), Purchaser will furnish to Seller's attorney a writing (the "**Title Report Objection Notice**") specifying any exceptions to title to the Property set forth in the Title Commitment which Purchaser believes are not Permitted Exceptions and "subject to" which Purchaser believes it is not required to accept title.  Purchaser's failure to deliver the Title Report Objection Notice to Seller on or prior to 5:00 p.m. Eastern Daylight Time on the Title Report Objection Date shall constitute Purchaser's irrevocable acceptance of the Title Report and Purchaser shall be deemed to have unconditionally waived any right to object to any matters set forth therein.  If, after giving the Title Report Objection

8963312.3

4

Notice to Seller, Purchaser learns, through continuation reports or other written evidence, of any title defect(s) which Purchaser claims are not Permitted Exceptions and "subject to" which Purchaser believes it is not required to accept title, Purchaser shall give written notice thereof to Seller immediately after the date Purchaser learns of same and Purchaser shall be deemed to have unconditionally waived any such matters as to which it fails to give such written notice to Seller within ten (10) days (as hereinafter defined) after the date Purchaser learns of same. Purchaser acknowledges and agrees that TIME IS OF THE ESSENCE with respect to all time periods set forth in this <u>Paragraph 7(b)</u>.

(c)  If, as of the Closing Date, Seller fails or is unable to convey to Purchaser title to the Property subject to and in accordance with the provisions of this Agreement due to no affirmative act of Seller, Seller shall be entitled, upon written notice delivered to Purchaser on or prior to the Closing Date, to reasonable adjournments of the Closing one or more times for a period not to exceed thirty (30) days in the aggregate to enable Seller to convey such title to the Property. If Seller does not so elect to adjourn the Closing, or if at the adjourned date Seller fails or is unable to convey title subject to and in accordance with the provisions of this Agreement, Purchaser may terminate this Agreement by written notice to Seller and Escrow Agent (as hereinafter defined) delivered on or promptly after the date scheduled for the Closing, in which event Escrow Agent shall repay to Purchaser the Deposit plus all accrued interest thereon. This Agreement shall thereupon be deemed canceled and become void and of no further effect, and neither party hereto shall have any obligations of any nature to the other hereunder or by reason hereof, except for any matter specifically provided to survive such termination. If Seller elects to adjourn the Closing as provided above, this Agreement shall remain in effect for the period or periods of adjournment, in accordance with its terms. Seller shall not be required to take or bring any action or proceeding or any other steps to remove any defect in or objection to title or to fulfill any condition precedent to Purchaser's obligations under this Agreement or to expend any moneys therefor, nor shall Purchaser have any right of action against Seller therefor, at law or in equity, except that Seller shall, on or prior to the Closing, pay, discharge or remove of record or cause to be paid, discharged or removed of record at Seller's sole cost and expense all of the following items: (a) Voluntary Liens (as hereinafter defined) and (b) other liens encumbering the Property (including judgments and federal, state and municipal tax liens) (other than open real estate taxes, water and sewer charges that are subject to adjustment in accordance with <u>Section 18</u> other than Permitted Exceptions) which (i) are in liquidated amounts and which may be satisfied solely by the payment of money (including the preparation or filing of appropriate satisfaction instruments in connection therewith) and (ii) do not exceed in the aggregate ten percent (10%) of the Purchase Price. The term "**<u>Voluntary Liens</u>**" as used herein shall mean liens and other encumbrances (other than Permitted Exceptions) which Seller has knowingly and intentionally placed or allowed to be placed on the Property, including without limitation, mortgages and mechanics' liens, but shall expressly exclude judgments and federal, state and municipal tax liens. FNB Detroit 2010 LLC joins in and approves this Agreement for the sole and limited purpose of agreeing to discharge all of its Encumbrances on and with respect to the Property at the

8963312.3

5

Closing in accordance with this Agreement and Seller's Plan of Reorganization (as defined below).

(d) Notwithstanding anything in Paragraph 7(c) above to the contrary, Purchaser may at any time accept such title as Seller can convey, without reduction of the Purchase Price (as hereinafter defined) or any credit or allowance on account thereof or any claim against Seller. The acceptance of the Deed (as hereinafter defined) by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Seller's part to be performed under this Agreement, except for such matters which are expressly stated in this Agreement to survive the Closing, to the limit of such survival.

(e) Other than the Permitted Exceptions, the Property will be sold and transferred to Purchaser free and clear of all Encumbrances pursuant to Section 363(f) of the Bankruptcy Code and applicable law. FNB Detroit 2010 LLC joins into this Agreement for the sole and limited purpose of agreeing, at the Closing, to fully and forever release, waive and discharge its Encumbrances with respect to the Property. FNB Detroit 2010 LLC represents and warrants that it is the first-priority lienholder with respect to the Property. FNB Detroit 2010 LLC will not object to or otherwise oppose: (i) Seller's sale and/or Purchaser's purchase of the Property pursuant to this Agreement; (ii) Seller's assumption and assignment to Purchaser of the Assumed Agreements pursuant to this Agreement; (iii) Seller's Plan of Reorganization (as defined below); and/or (iv) entry of the Confirmation Order (as defined below) by the Bankruptcy Court.

(f) The amount of any unpaid taxes, assessments and water and sewer charges which Seller is obligated to pay and discharge, with interest and penalties, may at the option of Seller be paid by Purchaser out of the balance of the Purchase Price, if bills therefor with interest and penalties thereon figured to said date are furnished to or obtained by the Title Company at the Closing for payment thereof and the Title Company duly omits from its title policy any exception therefor.

(g) If the Property shall, at the time of the Closing, be subject to any liens such as for judgments or transfer, inheritance, estate, franchise, license or other similar taxes or any encumbrances or other title exceptions which would be grounds for Purchaser to reject title hereunder, the same shall not be deemed an objection to title provided that, at the time of the Closing, either (a) Seller delivers immediately available funds at the Closing in the amount required to satisfy the same and delivers to Purchaser and/or the Title Company at the Closing instruments in recordable form (and otherwise in form reasonably satisfactory to the Title Company in order to omit the same as an exception to its title policy) sufficient to satisfy and discharge of record such liens and encumbrances together with the cost of recording or filing such instruments or (b) the Title Company pays such amounts from the net due Seller at Closing.

8. **Assumption and Assignment of the Assumed Agreements.**

(a) Each of the Assumed Agreements will assumed by Seller and, at Closing, assigned to Purchaser in accordance with Section 365 of the Bankruptcy Code,

8963312.3

6

free and clear of all Encumbrances. All Cure Costs to be paid to the non-debtor parties to each of the Assumed Agreements, in accordance with Section 365(b)(1)(A) of the Bankruptcy Code and applicable law, will be paid as follows:

> (1) Cure Costs with respect to the assumption and assignment to Purchaser of the unexpired lease of nonresidential real property between Seller, as landlord, and Honigman Miller Schwartz and Cohn LLP ("**Honigman**"), as tenant (the "**Honigman Lease**") shall be paid by Purchaser to Honigman or otherwise resolved pursuant to a separate agreement between Honigman and Purchaser. For the avoidance of doubt, pursuant to this Paragraph 8(a)(1) *but subject to all other provisions of this Agreement and only upon a Closing,* Purchaser will be responsible for all of Honigman's claims against Seller and FNB Detroit 2010 LLC, but only with respect to Seller's breaches, defaults or non-performance of the Honigman Lease; and

> (2) Cure Costs due with respect to the assumption and assignment to Purchaser of all Assumed Agreements other than the Honigman Lease will be paid as follows: (i) first, all Cure Costs totaling up to the sum of twenty-five thousand dollars ($25,000.00) in the aggregate will be paid by Seller; and (ii) second, any additional Cure Costs will be paid by Purchaser subject to the provisions of Paragraph 8(b) and Paragraph 22(f) below.

(b) Notwithstanding any provision of this Agreement to the contrary, in Purchaser's sole discretion, at any time prior to the conclusion of the hearing before the Bankruptcy Court, in the Bankruptcy Case, seeking entry of the Confirmation Order (as defined below) with respect to the Seller's Plan of Reorganization (as defined below), Purchaser may: (1) remove any executory contract or unexpired lease of Seller from or (2) add any executory contract or unexpired lease of Seller to the lists of Assumed Agreements attached as **Exhibit B, Exhibit C** and **Exhibit D**, respectively; provided, however, notwithstanding anything in this Paragraph 8(b) to the contrary, Purchaser may only remove an executory contract or unexpired lease of Seller from **Exhibit B, Exhibit C** or **Exhibit D** if the non-debtor party(ies) to such contract or lease (other than Honigman) has asserted that Cure Costs are owed in connection with the assumption and assignment to Purchaser of its contract or lease and the aggregate Cure Costs for all Assumed Agreements, excluding Cure Costs related to the Honigman Lease, exceed the sum of twenty-five thousand dollars ($25,000.00).

> (1) If Purchaser removes any of the Assumed Agreements from **Exhibit B, Exhibit C** and/or **Exhibit D**, then Purchaser shall have no liability whatsoever relating to or arising from that removed Assumed Agreement and neither Seller nor the

8963312.3

7

non-debtor party to the removed Assumed Agreement will have any Claim whatsoever against Purchaser relating to or arising from that removed Assumed Agreement.

(2)     For the avoidance of doubt, Paragraphs 8(b) and 8(b)(1) of this Agreement authorize the Purchaser to add or remove any executory contract or unexpired lease of the Seller from the lists of Assumed Agreements; provided that Purchaser may not remove the Honigman Lease from the lists of Assumed Agreements and Purchaser may only remove other executory contracts or unexpired leases from the lists of Assumed Agreement if (x) the non-debtor party to the subject contract or lease has asserted that Cure Costs are owed and (y) the Cure Costs for all Assumed Agreements exceeds the sum of twenty-five thousand dollars ($25,000.00).

9.     **Bankruptcy Matters.**

(a)     Plan of Reorganization.  Not later than fifteen (15) Business Days after the Effective Date, Seller shall file with the Bankruptcy Court: (i) a Plan of Reorganization with respect to Seller's bankruptcy estate that, among other things, implements, contains or otherwise incorporates the terms, conditions and provisions of this Agreement (the "**Plan of Reorganization**"), and (ii) a disclosure statement related to and accompanying the Plan of Reorganization (the "**Disclosure Statement**"), in each case in form and substance consistent with this Agreement and satisfactory to Purchaser in its reasonable discretion.  Seller shall use commercially reasonable efforts to obtain entry of an Order confirming the Plan of Reorganization (the "**Confirmation Order**") by no later than sixty (60) days after the Effective Date, and such Confirmation Order shall be in form and substance consistent with this Agreement and satisfactory to Purchaser in its reasonable discretion.  The Confirmation Order will provide, among other things, that: (i) the Plan of Reorganization is confirmed and the transactions contemplated therein are approved; (ii) this Agreement and the transactions contemplated herein are approved; (iii) on the Plan Effective Date, the Property shall be sold to Purchaser free and clear of any and all Encumbrances (except for Permitted Exceptions) pursuant to this Agreement; and (iv) on the Plan Effective Date, (x) the Assumed Agreements shall be assumed by Seller and assigned to Purchaser free and clear of all Encumbrances pursuant to Section 365 of the Bankruptcy Code and (y) Seller shall pay all Cure Costs to be paid by Seller, in connection with the assumption and assignment of the Assumed Agreements, pursuant to the provisions of Paragraph 8(a) of this Agreement.

(b)     In addition, the Confirmation Order will include, among other provisions which may reasonably be requested by Seller or Purchaser, the following provisions:

(1)     The transactions contemplated by the Agreement are approved pursuant to, *inter alia*, Sections 363, 365 and 1129 of the Bankruptcy Code;

(2)     The Plan of Reorganization contemplates the sale of the Property, and the assumption and assignment of all of the Assumed Agreements, to Purchaser, free and clear of all Encumbrances pursuant to Sections 365, 1123(b)(4), 1129(b)(2)(A), 1145 and 1146(a) of the Bankruptcy Code. Seller will not assign to Purchaser any executory contracts or unexpired leases of Seller which are not Assumed Agreements, and Purchaser will have no liability whatsoever with respect to any executory contracts or unexpired leases of Seller which are not Assumed Agreements. The sale shall be consummated pursuant to the Plan of Reorganization and this Agreement;

(3)     Payment of the Cure Costs shall be a full and final satisfaction of any and all defaults under the Assumed Agreements, whether monetary or non-monetary. Each non-debtor party to an Assumed Agreement is forever barred, estopped and permanently enjoined from asserting against Seller or the Purchaser, their successors or assigns or the property of any of them, any default based on all known and unknown facts and circumstances existing as of the date of the Closing. Notwithstanding the foregoing, all of Seller's rights to assert, and interests in, all credits, chargebacks, setoffs, recoupments, rebates and other claims under and/or relating to the Assumed Agreements are purchased by and assigned to the Purchaser, and are preserved for the Purchaser's use and benefit;

(4)     The Agreement and the consideration to be paid by the Purchaser under the Agreement constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and Section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory or possession thereof and the District of Columbia;

(5)     In accordance with the Plan of Reorganization, Seller and Purchaser shall, prior to the Plan Effective Date, take all steps necessary to consummate the sale. On the date of the Closing (as defined below), pursuant to the Agreement, Seller shall transfer the Property and the Assumed

Agreements to the Purchaser in exchange for payment, to Seller, of the Purchase Price. Distributions of the sale proceeds shall be in accordance with the priorities set forth in the Plan of Reorganization and applicable law, as well as any subsequent Final Order(s) of the Bankruptcy Court with respect to the distribution of such amounts;

(6)    Seller and Purchaser shall use commercially reasonable efforts and cooperate, assist and consult with each other to obtain prompt entry of the Confirmation Order, including furnishing affidavits, declarations and other documents or information for filing with the Bankruptcy Court;

(7)    The solicitation of votes on the Plan of Reorganization shall be deemed a solicitation of the holders of Claims for the approval of the Agreement and the sale. Entry of the Confirmation Order shall constitute approval of the Agreement and transactions contemplated hereby;

(8)    The entry of the Confirmation Order shall constitute authorization for Seller to take or to cause to be taken all actions necessary or appropriate to consummate and implement the provisions of the Plan of Reorganization prior to, on and after the Plan Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court, including, without limitation, the execution and delivery of this Agreement. Subject to the terms and conditions of this Agreement, all such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the stockholders or directors of Seller;

(9)    The sale shall not impose or result in the imposition of any liability or responsibility of Purchaser or its affiliates, successors or assigns or any of their assets (including the Property), and the transfer of the Property to Purchaser does not and will not subject Purchaser or its affiliates, successors or assigns or any of their assets (including the Assets), to any liability for any Claims including, without limitation, successor liability;

(10)    The matters specified in Section 18;

(11)    The Confirmation Order is a final order and the period in which an appeal must be filed shall commence on entry

thereof. Notwithstanding Fed. R. Bankr. Pr. 6004(h), 7062 and 9014, or any other statute, court rule, regulation or applicable law, the terms and conditions of the Confirmation Order shall be immediately effective and enforceable upon entry of the Confirmation Order. If any or all provisions of the Confirmation Order are reversed, modified or vacated by any subsequent order of the Bankruptcy Court or any other court, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan of Reorganization prior to the Debtor's receipt of written notice of such order. Notwithstanding any such reversal, modification or vacatur of the Confirmation Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, the Confirmation Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of the Confirmation Order and the Plan of Reorganization, and all related documents and any amendments or modifications thereto. The Debtor is authorized to consummate the Plan of Reorganization at any time after entry of the Confirmation Order; and

(12)   Nothing in the Plan of Reorganization or the Confirmation Order will conflict with or derogate from the terms and conditions of the Agreement.

(c)   **Notice to Parties**.

(1)   Seller shall provide timely and proper written notice of the Plan of Reorganization to all creditors of Seller, parties to the Assumed Agreements, and all other parties in interest (including applicable governmental agencies and taxing authorities).

(2)   Seller shall provide timely and proper written notice to each non-debtor party to each of the Assumed Agreements of the assumption and assignment of the Assumed Agreements and the proposed Cure Costs to be paid to each such non-debtor party to each of the Assumed Agreements.

(3)   The Bankruptcy Court's hearing regarding the assumption and assignment to Purchaser of the Assumed Agreements, and any objections thereto or to the proposed amount of any Cure Costs, will be conducted before or concurrently with the Bankruptcy Court's hearing regarding confirmation of Seller's Plan of Reorganization.

(4)     Seller will take all actions necessary to cause the Confirmation Order to be entered and the Assumed Agreements to be assumed by Seller and assigned to Purchaser, at Closing, pursuant to Section 365 of the Bankruptcy Code.

(d)    **Break-up Fee and Expense Reimbursement.**

(1)     In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, upon a termination of this Agreement due to an Alternative Transaction (defined below), Seller shall reimburse Purchaser for its reasonable, out-of-pocket costs and expenses (including reasonable attorneys' and consultants' fees) incurred by Purchaser in connection with this Agreement and the transactions contemplated hereby in an amount not to exceed $150,000 (the "**Expense Reimbursement**") plus a break-up fee in the amount of $250,000 (the "**Break-up Fee**"); provided, however, the Break-up Fee shall not be due and payable to Purchaser if Purchaser has committed a material breach of this Agreement prior to any such termination of this Agreement, which has not been cured by Purchaser. The Expense Reimbursement and Break-up Fee will be paid to Purchaser immediately upon the closing of an Alternative Transaction, prior to the payment of the proceeds of such sale to any third party asserting an Encumbrance on the Property (and no Encumbrance of any third party shall attach to the portion of the sale proceeds representing the Expense Reimbursement or the Break-up Fee). The Expense Reimbursement and the Break-up Fee will be paid to Purchaser as an allowed administrative expense claim in the Bankruptcy Case, pursuant to Section 503(b)(1) of the Bankruptcy Code, which shall have priority over every other claim allowable under such subsection;

(2)     Not later than seven (7) Business Days after the Effective Date, Seller shall file a motion with the Bankruptcy Court seeking the approval of the Bankruptcy Court, on an expedited basis, of the Expense Reimbursement and the Break-up Fee, in form substance reasonably acceptable to Purchaser. Seller shall use commercially reasonable efforts to obtain the Bankruptcy Court's approval of the Expense Reimbursement and the Break-up Fee on an expedited basis; and

(3)     Purchaser's receipt of the Expense Reimbursement and the Break-up Fee, and the return of the Deposit shall be the full and liquidated damages of Purchaser arising out of any termination of this Agreement pursuant to Section 22. The provisions of this Paragraph 9(d)(3) shall survive termination of this Agreement.

(e)     From the Effective Date through the date of the Bankruptcy Court's entry of the an order authorizing the Expense Reimbursement and the Break-up Fee (subject to compliance with Seller's duties under the Bankruptcy Code and applicable law), Seller shall not initiate contact with, solicit or encourage submission or any inquiries, proposals or offers for the Property by, any person or entity with respect to any Alternative Transaction. "**Alternative Transaction**" means the sale, transfer, lease or other disposition, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, of the Property in a transaction or a series of transactions with one or more persons or entities, other than Purchaser.

(f)     Seller shall provide to Purchaser drafts of the proposed Confirmation Order and the proposed order approving the Expense Reimbursement and the Break-up Fee, for Purchaser's review and comment, not less than five (5) business days before such orders are submitted to the Bankruptcy Court for entry (as exhibits to the Plan of Reorganization and the motion seeking approval of the Expense Reimbursement and the Break-up Fee, respectively).

10.     **As Is Sale**.

(a)     Except as is expressly set forth in this Agreement or in the Closing Documents (as defined below) to the contrary, including, without limitation, that the sale and purchase of the Property and the assignment of the Assumed Agreements to Purchaser shall be free and clear of all Encumbrances (other than Permitted Exceptions), Purchaser is expressly purchasing the Property in its existing condition "AS IS, WHERE IS, AND WITH ALL FAULTS" with respect to all facts, circumstances, conditions and defects, and, except as is expressly set forth in this Agreement or the Closing Documents to the contrary, Seller has no obligation to determine or correct any such facts, circumstances, conditions or defects or to compensate Purchaser for same. Seller has specifically bargained for the assumption by Purchaser of all responsibility to investigate the Property, and all laws and regulations, rights, facts and of all risk of adverse conditions and has structured the Purchase Price and other terms of this Agreement in consideration thereof. Purchaser has undertaken, or will undertake, all such investigations of the Property, laws and regulations, rights, and facts as Purchaser deems necessary or appropriate under the circumstances as to the status of the Property and based upon same, except as is expressly set forth in this Agreement to the contrary, Purchaser is and will be relying strictly and solely upon such inspections and examinations and the advice and counsel of its own consultants, agents, legal counsel and officers, and Purchaser is and will be fully satisfied that the Purchase Price is fair and adequate consideration for the Property and, by reason of all the foregoing,

8963312.3

13

Purchaser assumes the full risk of any loss or damage occasioned by any fact, circumstance, condition or defect pertaining to the Property.

(b)     Except as is expressly set forth in this Agreement or in the Closing Documents to the contrary, Seller hereby disclaims all warranties of any kind or nature whatsoever (including, without limitation, warranties of habitability and fitness for particular purposes), whether expressed or implied, including, without limitation, warranties with respect to the Property. Except as is expressly set forth in this Agreement or in the Closing Documents to the contrary, Purchaser acknowledges that it is not relying upon any representation of any kind or nature made by Seller, or Broker (as hereinafter defined), or any of their respective direct or indirect members, partners, shareholders, officers, directors, employees or agents (collectively, the "**Seller Related Parties**") with respect to the Property, and that, in fact, no such representations were made except as expressly set forth in this Agreement. To the extent required to be operative, the disclaimers and warranties contained herein are "conspicuous" disclaimers for purposes of any applicable law, rule, regulation or order.

(c)     Except as expressly set forth in this Agreement, Seller makes no warranty with respect to the presence of Hazardous Materials on, above or beneath the Land (or any parcel in proximity thereto) or in any water on or under the Property. Purchaser's closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause Seller to be joined in any action brought under any Environmental Laws (as hereinafter defined) except as required by Environmental Laws. The term "**Hazardous Materials**" shall mean (a) those substances included within the definitions of any one or more of the terms "hazardous materials", "hazardous wastes", "hazardous substances", "industrial wastes", and "toxic pollutants", as such terms are defined under the Environmental Laws, or any of them, (b) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (c) natural gas, synthetic gas and any mixtures thereof, (d) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable, (e) polychlorinated biphenyl ("**PCBs**") or PCB-containing materials or fluids, (f) radon, (g) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, and (h) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring or remediation. The term "**Environmental Laws**" shall mean all federal, state and local laws, statutes, ordinances and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C.

8963312.3

14

§§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S. §§ 6901 et seq.), the Toxic Substances Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), any state or local counterpart or equivalent of any of the foregoing, and any federal, state or local transfer of ownership notification or approval statutes.

(d)     Purchaser shall rely solely upon Purchaser's own knowledge of the Property based on its investigation of the Property and its own inspection of the Property in determining the Property's physical condition. Except as expressly set forth in this Agreement or in the Closing Documents to the contrary, Purchaser releases Seller, the Seller Related Parties and their respective successors and assigns from and against any and all claims which Purchaser or any party related to or affiliated with Purchaser (each, a "**Purchaser Related Party**") has or may have arising from or related to any matter or thing related to or in connection with the Property, except as expressly set forth in this Agreement or in the Closing Documents to the contrary, including the documents and information referred to herein, the Assumed Agreements (except as otherwise set forth in this Agreement) thereunder, any construction defects, errors or omissions in the design or construction and any environmental conditions, and, except as expressly set forth in this Agreement or in the Closing Documents to the contrary, neither Purchaser nor any Purchaser Related Party shall look to Seller, the Seller Related Parties or their respective successors and assigns in connection with the foregoing for any redress or relief. This release shall be given full force and effect according to each of its express terms and provisions, including those relating to unknown and unsuspected claims, damages and causes of action. To the extent required to be operative, the disclaimers and warranties contained herein are "conspicuous" disclaimers for purposes of any applicable law, rule, regulation or order.

(e)     The provisions of this <u>Section 10</u> shall survive the closing or earlier termination of this Agreement or the Closing Date and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

11.     **Affidavit Affecting Title**. In connection with Seller's and Purchaser's execution of this Agreement, Seller and Purchaser shall execute and deliver to each other an affidavit affecting title in the form attached hereto as **Exhibit F** ("**Affidavit**"), which shall be delivered to the Title Company to be recorded with the Wayne County, Michigan Register of Deeds. Purchaser shall also execute and deliver into escrow with the Title Company a release of the Affidavit at such time, which the Title Company may record only upon receipt of Seller's and Purchaser's written affidavit that this Agreement has been terminated pursuant to its terms and provisions. Seller and Purchaser shall split equally all costs and fees charged by the Title Company to record the Affidavit and the release thereof.

12.    **Representations, Warranties, and Covenants of Seller.**  Seller hereby represents and warrants to and covenants with Purchaser as of the date of this Agreement and as of the date of the Closing that:

(a)    Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware and qualified to do business in the State of Michigan, and has all necessary power and authority to enter into this Agreement with Purchaser, to convey title to the Property in the condition required hereunder and to perform all of its other obligations under this Agreement.

(b)    The execution and delivery by Seller of this Agreement and the other documents and instruments required under this Agreement, and the performance by Seller of all of its obligations under this Agreement and such other documents and instruments have been duly authorized by all necessary limited liability company action, and do not and will not (I) result in a breach or violation of or default under Seller's operating agreement, or under any commitment, order, judgment, or decree by which the Property or Seller is bound, (ii) violate any statute, regulation, order, or other law to which the Property or Seller is subject, or (iii) require Seller or Purchaser to obtain any consent, approval, and/or permit from any person, entity, or governmental authority, or to comply with or perform any special requirements, procedures, approvals, or actions.

(c)    Except with the prior written consent of Purchaser, not to be unreasonably withheld or delayed, Seller shall not amend, extend, terminate, accept surrender of, or permit any assignments or subleases of, any of the Leases or Parking Licenses, nor accept any rental payment which constitutes payment in advance, or accelerate the rent due as a result of any default by a tenant under any of the Leases or Parking Licenses.  Seller shall provide Purchaser with an updated Rent Roll and Lease schedule within three (3) business days prior to the expiration of the Inspection Period.

(d)    To the best of Seller's knowledge, information and belief, the Rent Roll is a true, accurate and correct list of all of the leases presently in force and affecting the Property and truly, accurately, fully and completely sets forth the information contained or to be contained therein, including any rent concessions, rebates, allowances, or free rent for any period after the date of the Closing.  To the best of Seller's knowledge, information and belief, the list of Parking Licenses is a true, accurate and complete list of all of the parking licenses and the rights of any person or entity to use or occupy all or any portion of the Property and truly, accurately, fully and completely sets forth the information contained or to be contained therein, including any rent concessions, rebates, allowances, or free rent for any period after the date of the Closing.  Notwithstanding the provisions of this Paragraph 12(d), Seller has not entered into, or granted, any unexpired lease or option with respect to the Real Property which is not listed on the Rent Roll.

(e)    There are no leases, agreements, agreements of sale, options, licenses, management contracts, employment agreements, equipment agreements, supply agreements, water agreements, sewer agreements, utility or concession

8963312.3

16

agreements or agreements with municipalities (including improvements or development escrow or bonds), license agreements, service agreements, purchase option agreements, contracts, or arrangements, oral or written, relating to, affecting or binding on the Property or any part thereof (or Purchaser as the new owner thereof), which Seller has not disclosed to Purchaser. Seller is unaware of any errors on attached **Exhibit B, Exhibit C** and **Exhibit D.**

(f) At or before Closing, Seller shall pay all Cure Costs to be paid by Seller in connection with the assumption and assignment to Purchaser of the Assumed Agreements in accordance the provisions of Paragraph 8(a) of this Agreement.

(g) There are no brokerage or leasing commissions or other compensation are or will be due or payable by Seller to any person, firm, corporation or other entity with respect to or on account of any of the Leases or any extensions or renewals thereof, prior to the date of the Closing except as set forth in the Lease.

(h) From and after the date hereof, Seller shall not alter or modify the physical nature or characteristics of the Property or any part thereof.

13. **Inspection Period.**

(a) Purchaser shall have the right, during the period beginning on the Effective Date and ending on the date which is thirty (30) days after the Effective Date (the "**Inspection Period**"), to enter the Property to undertake, at its sole cost and expense, site, engineering, appraisal, soil tests, environmental and such other inspection analyses and studies of the Property as Purchaser may desire, and Purchaser shall have the right to review the Leases, Parking Licenses, all contracts of Seller, and other documents relating to the Property and to take such other actions as Purchaser deems necessary to satisfy itself that it wishes to proceed with the purchase of the Property, including, without limitation, contacting the tenants under the Leases or licensees under the Parking Licenses. Such investigations may be conducted by Purchaser or any designee of Purchaser, including, without limitation, engineers, attorneys, accountants, architects and Purchaser's employees, during normal business hours and upon reasonable notice to Seller or its designated agents. Seller shall (a) reasonably cooperate with Purchaser in the course of Purchaser's investigation, (b) provide such reasonable documents relating to the operation of the Property as reasonably requested by Purchaser and (c) make available to Purchaser such persons, agents and representatives of Seller who are involved with the operation, management or maintenance of the Property. Purchaser shall indemnify, defend, and hold Seller harmless from and against any and all claims, losses, damages, costs and expenses (including reasonable attorneys' fees) to the extent arising from claims of property damage or personal injury caused by the acts of Purchaser, its employees or agents in connection with such inspections. The preceding sentence shall survive the termination of this Agreement. Seller shall immediately direct Property Manager to provide Purchaser will full access to all leases, service contracts, insurance policies, income and expense statements and all other documents generated or maintained in

8963312.3

17

connection with the operation of the Property and to reasonably cooperate with Purchaser in connection with its due diligence inspection of the Property and the books and records. Purchaser shall be entitled to inspect the Property from time to time between the date hereof any Closing on reasonable advance notice to Seller and subject to the rights of tenants under the Leases. Seller shall immediately provide or make available to Purchaser copies of all surveys, title insurance policies, engineering feasibility studies, soil tests, topographical drawings and surveys, wetland studies, engineering plans, environmental reports, services contracts, maintenance agreements, blue prints, site plans, architectural plans, "as built" plans locating all utilities, roads, buildings, structures, parking areas and improvements located on the Property, permits, licenses, real estate tax bills, utility and other bills for the prior three years, all Leases, Parking Licenses and Guaranties (as defined below), information regarding any pending or threatened litigation with respect to the Property, federal, state and local authorizations issued or required to be issued with respect to the Property, including any letters from any governmental authorities with respect to violations on the Property or Seller's use thereof, and such other information as maybe reasonably requested by Purchaser, all of which shall automatically and immediately become the sole property of Purchaser upon the Closing or promptly returned to Seller if this Agreement is terminated.

      (b)    During the Inspection Period, Purchaser may, in its sole discretion, amend the designations of Assumed Agreements as listed on attached **Exhibit B, Exhibit C** and **Exhibit D**.

      (c)    If Purchaser determines, in its sole discretion, that Purchaser does not desire to proceed with the purchase of the Property prior to the expiration of the Inspection Period, then, notwithstanding any other provision of this Agreement to the contrary, Purchaser shall have the right to cancel and terminate this Agreement by so notifying Seller of its election to cancel and terminate this Agreement on or before the expiration of the Inspection Period, TIME BEING OF THE ESSENCE, and upon such cancellation and termination, the entire Deposit and all accrued interest shall be immediately returned to Purchaser by the Title Company, and neither party to this Agreement shall have any further obligation, liability or responsibility to the other under this Agreement, except as otherwise expressly provided in this Agreement.

      (d)    Notwithstanding the foregoing, from and after the expiration of the Inspection Period through the date of the Closing, Purchaser shall have the right to continue to enter upon the Property for purposes of inspecting the Property and performing any tests or studies it desires.

      14.    **Purchaser's Conditions Precedent.** The obligations of Purchaser under this Agreement are expressly conditioned upon the satisfaction or waiver of the following conditions:

      (a)    The Title Insurance Commitment shall demonstrate that title to the Property is vested in Seller subject only to the Permitted Exceptions, and, at Closing,

8963312.3

18

Seller shall provide Purchaser with a marked-up copy of the Title Insurance Commitment consistent with the foregoing.

(b)     All conditions, covenants and requirements of this Agreement shall have been satisfied or waived.

(c)     All representations and warranties of Seller shall be materially true, accurate and complete as of the date hereof and as the date of Closing.

(d)     All obligations of Seller under this Agreement shall have been fully satisfied and completed by Seller at or prior to the Closing.

(e)     FNB Detroit 2010 LLC shall have executed this Agreement, solely with respect to its agreement to discharge all of its Encumbrances on and with respect to the Property in accordance with Seller's Plan of Reorganization.

(f)     The Bankruptcy Court shall have entered the Confirmation Order in the Bankruptcy Case, authorizing all of the transactions contemplated by this Agreement, free and clear of all Encumbrances, and approving this Agreement and the ancillary agreements contemplated hereby, under Sections 105(a), 365, 1123 and 1129 of the Bankruptcy Code, in form and substance reasonably acceptable to Seller and Purchaser, and, as of the Closing Date, the Confirmation Order shall be a Final Order and shall not be stayed or appealed, shall be in full force and effect, and shall not have been vacated or reversed.

(g)     The Bankruptcy Court shall have entered a Final Order approving the Expense Reimbursement and the Break-Up Fee.

(h)     The Plan Effective Date shall have occurred or shall occur as a result of the Closing.

(i)     All of the Assumed Agreements shall have been assumed by Seller and assigned to Purchaser in accordance with Section 365 of the Bankruptcy Code and applicable law, and all Cure Costs to be paid by Seller in connection with the assumption and assignment to Purchaser of the Assumed Agreements, in accordance with the provisions of Paragraph 8(a), shall have been paid in full by Seller.

(j)     No injunctions, stay or similar order, issued by any court, tribunal or governmental authority shall be in effect that restrains, enjoins, stays or prohibits the consummation of the transactions contemplated by this Agreement.

In the event that any of the foregoing conditions precedent are not fully satisfied on the date of the Closing, Purchaser shall have the right to terminate this Agreement upon notice to Seller and upon such termination, the Deposit shall be immediately returned to Purchaser by the Title Company and neither party to this Agreement shall have any further obligation, liability or responsibility to each other under this Agreement, except as otherwise expressly provided in this Agreement. Notwithstanding the

foregoing, Purchaser may waive any unsatisfied condition precedent and proceed to the Closing subject thereto.

15. **Place and Time of Closing.** The closing of the transaction contemplated under this Agreement (the "**Closing**") shall take place through the office of the Title Company at a mutually convenient time on a mutually convenient date not later than twenty (20) days after the date upon which the Bankruptcy Court enters the Confirmation Order and the Confirmation Order becomes a Final Order; provided that if such twentieth (20th) day shall fall on a day which is not a Business Day, the Closing shall automatically be adjourned to the next Business Day. At the Closing:

(a)     Seller shall execute and deliver to Purchaser or Purchaser's designee a customary Covenant Deed (the "**Deed**"), conveying to Purchaser or Purchaser's designee title to the Property free and clear of all Encumbrances, subject only to the Permitted Exceptions.

(b)     To the extent not previously paid by Seller, Seller shall pay all Cure Costs to be paid by Seller in connection with the assumption and assignment to Purchaser of the Assumed Agreements in accordance with the provisions of Paragraph 8(a).

(c)     Seller shall cause each of the Assumed Agreements to be assigned to Purchaser in accordance with the terms and conditions of this Agreement.

(d)     Seller shall provide Purchaser with a true, correct and complete copy of each of the Assumed Agreements.

(e)     Purchaser shall pay to Seller the Purchase Price, as adjusted by the adjustments and prorations provided for in this Agreement.

(f)     Purchaser shall pay all Cure Costs to be paid by Purchaser in connection with the assumption and assignment to Purchaser of the Assumed Agreements in accordance with the provisions of Paragraph 8(a); provided that Purchaser may enter into a separate agreement with Honigman regarding the Cure Costs related to the assumption and assignment of the Honigman Lease.

(g)     Seller and Purchaser shall each execute and deliver to each other an appropriate closing statement setting forth the Purchase Price and reflecting all credits, adjustments and prorations provided for in this Agreement.

(h)     Seller shall execute and deliver to Purchaser and the Title Company such affidavits with respect to the Property as the Title Company shall require in order to delete from its title insurance policy all of the so-called "standard exceptions."

(i)     Seller shall execute and deliver to Purchaser a non-foreign person affidavit or a qualifying statement sufficient in form and substance to relieve Purchaser of any and all obligation to deduct, withhold or pay any amount of tax pursuant to

Section 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**") or a statement from Seller authorizing Purchaser to deduct and withhold taxes as required by Section 1445 of the Code.

(j)     Seller shall execute and deliver to Purchaser a valid assignment of the Leases and any guaranties executed in connection therewith (collectively, the "**Guaranties**"), and an assignment of the Parking Licenses assigning to Purchaser all of the landlord/licensor's interest in and to the Leases, the Parking Licenses and the Guaranties, together with an original executed copy of each of the Leases, Parking Licenses and Guaranties.

(k)     Seller shall execute and deliver to Purchaser a quit claim bill of sale covering the Personal Property.

(l)     Seller shall deliver to Purchaser originals of the following instruments in the possession of Seller or its agents or representatives (or copies if originals are unavailable): (i) all leases and other occupancy agreements for the Property; (ii) all building records in Seller's possession or control with respect to the Property; and (iii) all assigned guaranties and warranties.

(m)     Seller shall deliver to Purchaser all keys and combinations to locks at the Property, all plans, specifications, as-built drawings, surveys, site plans, equipment manuals, technical data and other documentation relating to the building systems, equipment and any other personal property forming part of the Property or any portion thereof in the possession of Seller or any property manager(s), representatives or agents of Seller.

(n)     Seller shall deliver to Purchaser exclusive possession of the Property in the condition existing on the Effective Date, subject to the rights of no persons whatsoever, except for those tenants set forth on the Rent Roll and the Parking Licenses set forth on **Exhibit D**.

(o)     Seller shall execute and deliver to Purchaser an assignment and delivery of all claims, guaranties, warranties, indemnification and all other rights, if any, which Seller may have against suppliers, laborers, materialmen, contractors or subcontractors arising out of or in connection with the installation, construction and maintenance of the improvements, fixtures and personal property on or about the Property.

(p)     Seller shall deliver to Purchaser licenses and certificates of occupancy or such other comparable certificates or documents issued by the appropriate governmental authority with respect to the Property or any part thereof in Seller's possession.

(q)     Seller shall deliver to Purchaser evidence of Seller's authority to enter into this transaction which evidence shall be satisfactory to Purchaser.

8963312.3

21

(r)     Seller shall deliver to Purchaser a notice to all tenants and parking licensees of the change of ownership of the Property.

(s)     At the Closing, Purchaser shall receive the marked-up Title Insurance Commitment, insuring fee simple title to the Property in the name of Purchaser subject only to the Permitted Exceptions, to be delivered by the Title Company to Purchaser pursuant to this Agreement.

(t)     Seller shall deliver to Purchaser an updated Rent Roll certified to be true, correct and complete and dated no later than two (2) days prior to the date of the Closing.

(u)     Purchaser and Seller shall execute and deliver to each other such other documents as are contemplated to be executed and/or delivered pursuant to the provisions of this Agreement.

(v)     The documents delivered pursuant to Paragraphs 15(a), (f), (g), (h), (i), (j), (n), (p), (q), (s) and (t) are sometimes collectively referred to as the "**Closing Documents**."

16.     **Default**.

(a)     If Purchaser defaults under the terms of this Agreement, Seller may, as its sole option, declare a forfeiture hereunder and retain the Deposit as its sole and liquidated damages, the same to be Seller's sole and exclusive remedy for any breach hereunder by Purchaser; provided that Seller shall provide Purchaser with prior written notice of any such default and a three (3) business day period to cure any such default; and further provided that no such notice shall be required for a failure by Purchaser to close on the Closing Date.

(b)     If Seller defaults under the terms of this Agreement, Purchaser may, at its option, (a) obtain specific performance of Seller's obligations under this Agreement, (b) terminate this Agreement and demand, and be entitled to, an immediate refund of the Deposit and all accrued interest thereon, or (c) exercise any other right or remedy available to Purchaser at law or in equity if specific performance is not available due to Seller's acts or omissions. Nothing contained in this Section 16 shall limit Purchaser's right to the Break-up Fee and the Expense Reimbursement in the event of an Alternative Transaction.

17.     **Real Estate Brokerage Commissions.** Except for Friedman Real Estate Group, Inc. ("**Broker**"), Seller and Purchaser each represent and warrant to the other that each party has not dealt with any realtor, broker, finder or intermediary in connection with the transaction contemplated under this Agreement. At the Closing, Seller shall pay to Broker a commission equal to three percent (3%) of the Purchase Price, and Purchaser shall have no liability therefor. Each party to this Agreement shall indemnify, defend, and hold harmless the other party from and against any and all real estate brokerage commissions, finder's fees, or other like charges due or claimed to be

due to any other broker who dealt with the party from whom indemnification is sought with respect to the transaction contemplated hereunder. The provisions of this <u>Section 17</u> shall survive any termination of this Agreement and the Closing of the transaction contemplated under this Agreement.

18.   **Taxes and Prorated Items.**

(a)     At or prior to the Closing, all taxes and assessments which are an Encumbrance on the Property as of the date of Closing shall be paid in full by Seller, or otherwise fully and forever discharged by Seller or the Bankruptcy Court. At the Closing, current real estate taxes for the period in which the Closing occurs shall be prorated and adjusted as of the date of Closing in accordance with the due date basis of the municipality or taxing unit in which the Property is located. All rents from tenants under the Leases, all utilities, operating expenses and other apportionable income and expenses paid or payable by Seller (which are not reimbursable by the tenants) shall be apportioned pro rata on a per diem basis as of the date of Closing. Seller shall cause all public utilities serving the Property to issue final bills to Seller on the basis of readings made as of the date of Closing and all such bills shall be paid by Seller. Each party shall separately reconcile with tenants the amounts paid or payable on account of operating expenses, if any, incurred by such party during its period of ownership in accordance with the terms of the Leases. Seller shall pay all transfer taxes in connection with the sale of the Property.

(b)     Seller shall, at Seller's option, pay to, or assign to, with a corresponding credit to Purchaser in the amount thereof on the closing statement to be executed by the parties at Closing, Purchaser all security deposits under the Leases, together with any interest accrued thereon, as well as any other funds paid to Seller by tenants or parking licensees on account of additional rent items not yet due and payable by Seller, such as tax and insurance escrows.

(c)     Seller and Purchaser acknowledge and agree that the transactions contemplated by this Agreement will be consummated pursuant to a confirmed Plan of Reorganization in the Bankruptcy Case. As a result, as contemplated by Section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument of transfer, including the filing of any deed or other document to evidence, effectuate or perfect the rights, transfers and interests contemplated by this Agreement, shall be free and clear of any and all transfer taxes, stamp taxes or similar taxes. All deeds, instruments, Orders and agreements transferring the Purchased Assets to Purchaser shall contain the following endorsement:

"Because this [instrument] has been authorized pursuant to Grantor's plan of reorganization that was confirmed by order of the United States Bankruptcy Court for the Southern District of New York, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. §1146(a)."

8963312.3

In the event that, notwithstanding the provisions of Section 1146(a) of the Bankruptcy Code or for any other reason, any sales, use, value added, transfer, stamp, recording, documentary, registration, or similar taxes, fees or charges (the "**Transfer Taxes**") are assessed at Closing or at any time thereafter on the transfer of the Purchased Assets pursuant to this Agreement, then in each instance such Transfer Taxes incurred as a result of the transactions contemplated by this Agreement shall be paid by Seller.

19. **Risk of Loss; Casualty; Condemnation.**

(a)     Until the completion of the Closing, all risk of any loss or damage to all or a portion of the Property shall be and remain on Seller. In the event any loss or damage shall occur to the Property in an amount in excess of $250,000 prior to the Closing by either fire or other casualty, Seller shall deliver to Purchaser written notice of such loss or damage along with its estimate of the amount of such loss or damage within five (5) calendar days of such event occurring. Within ten (10) calendar days after Purchaser's receipt of Seller's written notice, Purchaser may, at its option, elect to either: (1) terminate this Agreement, in which event the Deposit shall be promptly returned to Purchaser by the Title Company and neither party shall thereafter have any further liability, obligation or responsibility to the other under this Agreement, or (2) proceed with the transaction contemplated under this Agreement, in which event Seller shall assign to Purchaser at the Closing all of its right, title and interest to the proceeds of any insurance covering such loss or damage (including any rent loss/business interruption insurance allocable to the period from and after the Closing), and Purchaser shall receive a credit against the Purchase Price at the Closing in the amount of any deductible of such insurance and any under-insured amounts.

(b)     If any condemnation or eminent domain proceeding is commenced or threatened against the Property, or any part thereof, Seller shall, promptly after obtaining knowledge thereof, give Purchaser written notice thereof in reasonable detail. In such event, Purchaser shall, at its option, either (i) terminate this Agreement by written notice thereof to Seller within sixty (60) days after Purchaser's receipt of Seller's notice of such proceeding, in which case the Deposit shall be promptly returned by the Title Company to Purchaser and neither party to this Agreement shall have any further obligation, liability or responsibility to the other under this Agreement, except as otherwise provided in this Agreement or (ii) proceed with the transaction contemplated hereunder and receive from Seller at Closing an assignment of all awards and damages relating to the Property under such proceedings.

20.     **Notice.** Any notice or other communication required or desired to be given hereunder shall be in writing and shall be deemed to have been sufficiently given for all purposes of this Agreement if (a) delivered personally or (b) sent by reputable national overnight courier, charges prepaid, and (c), in either case, addressed to the party to whom the same is directed at the address of such party as set forth above. Any notice which is delivered by (i) reputable national overnight courier shall be deemed to be given on the date one (1) business day after the same is delivered to such reputable national overnight courier, provided, that such notice is sent for next business day

8963312.3

24

delivery and such carrier guarantees next business day delivery and the same is actually delivered to (whether or not refused by) the recipient in the ordinary course, and (ii) personally shall be deemed to be given on the date of receipt or refusal to accept receipt. Any party may change its address for purposes of this Agreement, or add an additional party to which notices must be delivered, by giving the other party notice thereof in the manner hereinabove provided for the giving of notices.

(a)     A copy of any notice to Seller shall be delivered by like means to Kriss & Feuerstein LLP, 360 Lexington Avenue, New York, NY 10017, Att: David Kriss.

(b)     A copy of any notice to Purchaser shall be delivered by like means to Honigman Miller Schwartz and Cohn LLP, 38500 Woodward Avenue, Suite 100, Bloomfield Hills, MI 48304-5048, Att: Howard N. Luckoff.

21.     **No Assumption of Liabilities.**

(a)     The parties acknowledge that this transaction contemplates only the sale and purchase of the Property and the Assumed Agreements and that Seller is not selling a business nor do the parties intend that Purchaser be deemed a successor of Seller with respect to any liabilities of Seller to any third parties other than the tenants under the Leases. Accordingly, Purchaser shall neither assume nor be liable for any of the debts, liabilities, taxes or obligations of, or claims against, Seller, or of any other person or entity, of any kind or nature, whether existing now, on the date of the Closing or at any time thereafter. All of such debts, liabilities, taxes, obligations and claims shall be solely those of Seller, and Seller hereby represents, warrants, covenants and agrees to defend, indemnify and hold harmless Purchaser from any liability with respect thereto. The debts, liabilities, taxes, obligations and claims for which Seller alone is liable shall include, without limitation (a) all payments, benefits and contribution agreements with respect to past and/or present employees of Seller or its affiliates in connection with the business of Seller or its affiliates (including, but not limited to, salaries, wages, commissions, bonuses, vacation pay, health and welfare contributions or benefits, including any group health continuation coverage obligation under COBRA, pensions, profit sharing, severance or termination pay, or any other form of compensation or fringe benefit), (b) obligations of Seller under any Assumed Agreements.

(b)     Purchaser shall not be deemed to: (1) be the successor of Seller or any of its affiliates; (2) have, de facto, or otherwise, merged with or into Seller or any of its affiliates; (3) be a mere continuation or substantial continuation of Seller or any of its affiliates or their enterprise(s); or (4) be liable for any acts or omissions of Seller in the conduct of Seller's business or arising under or related to the Property other than as set forth in this Agreement. Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing of the transactions contemplated by this Agreement, whether now existing or hereafter arising, or whether fixed or contingent, with respect to Seller's business or any obligations of Seller or its predecessors or Seller Related Parties arising prior to the Closing of the transactions

8963312.3

25

contemplated by this Agreement, except as provided in this Agreement, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of Seller's business prior to the Closing.

(c)     Seller shall be fully responsible for all operations of Seller's business from the Property prior to the date of the Closing, including, but not limited to, all suits, actions, damages and claims which may be asserted or threatened against the Purchaser from and after the date of the Closing, but which shall have arisen out of any aspect of the business or its operations prior to the date of the Closing.

22.     **Grounds for Termination**.

(a)     This Agreement may be terminated by Purchaser, in Purchaser's sole discretion, at any time during and prior to the end of the Inspection Period.

(b)     This Agreement may be terminated at any time prior to the Closing:

(1)     by Purchaser if any of Purchaser's conditions precedent to Close, as set forth in Section 14, have not occurred;

(2)     by Purchaser in accordance with Section 16;

(3)     by Purchaser if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or a trustee or examiner is appointed for Seller or Seller's assets;

(4)     by Purchaser if (i) the Confirmation Order has not been entered by the Bankruptcy Court on or before the date which is sixty (60) days after the Effective Date; provided that Purchaser shall not be entitled to exercise its rights under this clause if the Confirmation Order has been entered by the Bankruptcy Court prior to Purchaser exercising such rights; or (ii) following entry of the Confirmation Order, if the Confirmation Order is materially and adversely modified by any other order of the Bankruptcy Court, any other court of competent jurisdiction, or any governmental authority, and such other order is not reversed, revoked, voided, vacated, stayed or further modified with thirty (30) days such that the Confirmation Order is in full force and effect;

(5)     by Purchaser if on or before the date which is twenty (20) days after the Effective Date, the Bankruptcy Court shall not have entered a Final Order approving the Expense Reimbursement and the Break-Up Fee;

> (6)     by Purchaser if the Cure Costs for the Assumed Agreements
>         (other than the Honigman Lease) exceed the sum of twenty-
>         five thousand dollars ($25,000.00) in the aggregate; and/or
>
> (7)     by Purchaser if, after the Execution Date, any new lease
>         agreement with respect to the Real Property is made, or any
>         unexpired lease agreement with respect to the Real Property
>         is amended, which Purchaser determines, in Purchaser's
>         reasonable discretion and in good faith, is: (i) commercially
>         unreasonable; or (ii) below prevailing market rates for similar
>         leased premises.

23.     **Tax Free Exchange.** Seller shall have the right to transfer the Property to Purchaser pursuant to the exchange provisions of Section 1031 of the Internal Revenue Code of 1986, as amended and pursuant to this Agreement. In the event Seller elects to transfer the Property subject to such provisions, Purchaser shall assist Seller at no cost to Purchaser in connection with the acquisition of the exchange property including, without limitation, entering into an exchange contract, if required and such other necessary documents; provided, however, that Seller shall indemnify and hold Purchaser harmless from and against any loss or liability (including reasonable attorneys' fees) Purchaser may incur as a result of said exchange. Seller shall be permitted to adjourn the date established for Closing pursuant to Section 15 to a date that is no more than thirty (30) days after the date established for Closing in order to facilitate the exchange as described in this Section 23.

24.     **Jurisdiction; Waiver of Jury Trial.**

(a)     Prior to the closing of the Bankruptcy Case, except as otherwise expressly provided in this Agreement, any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated by this Agreement shall be brought exclusively in the Bankruptcy Court, and each of the parties irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on either party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 20 shall be deemed effective service of process on such party.

(b)     Upon the closing of the Bankruptcy Case, except as otherwise expressly provided in this Agreement, any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this

8963312.3

27

Agreement or the Transactions may be brought in any court having subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Michigan, and Seller and Purchaser irrevocably consents to the jurisdiction of the United States District Court for the Eastern District of Michigan (or if such court refuses to exercise jurisdiction over the Parties or the subject suit, action or proceeding, then the Circuit Court for Wayne County, Michigan (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on either party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in <u>Section 20</u> shall be deemed effective service of process on such party.

      25.   **No Third Party Beneficiaries.**  The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

      26.   **Miscellaneous.**

      (a)   This Agreement may be amended or modified only by the written agreement of both Seller and Purchaser, and the same constitutes the entire agreement of Seller and Purchaser, and FNB Detroit 2010 LLC, with respect to the subject matter hereof and all prior negotiations are hereby merged herein.

      (b)   Each exhibit attached to this Agreement is incorporated and made a part of this Agreement as though fully set forth in this Agreement.

      (c)   If the deadline for performing any act would otherwise fall on a day which is not a Business Day, such deadline shall automatically be extended to the next succeeding Business Day. Time is of the essence with respect to this Agreement and all time periods and dates set forth herein.

      (d)   This Agreement shall be interpreted under and governed by the laws of the State of Michigan. The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits, schedules or amendments hereto. Singular words shall connote the plural as well as the singular, and plural words shall connote the singular as well as the plural, and the masculine shall include the feminine and the neuter, as the context may require.

(e)     The terms and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties to this Agreement and their respective heirs, representatives, successors, and assigns.

(f)     This Agreement may be executed in counterparts, and all such executed counterparts shall constitute the same agreement. It shall be necessary to account for only one such counterpart in proving this Agreement. In order to expedite the transaction contemplated herein, executed copies of this Agreement may be delivered via telecopy or facsimile or e-mail. Seller and Purchaser intend to be bound by the signatures on the telecopied or e-mailed document, are aware that the other party will rely on the telecopied or e-mailed signatures, and hereby waive any defenses to the enforcement of the terms of this Agreement based on the form of delivery of the signature.

(g)     Other than as may be required by the Bankruptcy Code or the Bankruptcy Court, any release to the public, at any time prior to or after Closing, of information with respect to the sale contemplated herein or any matters set forth in this Agreement will be made only in the form approved by Purchaser and Seller and their respective counsel.

(h)     Each party agrees that it will without further consideration execute and deliver such other documents and take such other action, as may be reasonably requested by the other party to consummate more effectively the purposes or subject matter of this Agreement, at no material cost to the party whose cooperation is being requested. This Paragraph 26(h) shall survive the Closing for a period of one (1) year.

(i)     All representations and warranties made in this Agreement by either Seller or Purchaser shall survive the date of the Closing and continue thereafter in full force and effect. Seller may not assign this Agreement.

(j)     Unless otherwise specified in this Agreement, references to "Sections" and "Paragraphs" are references to Sections and Paragraphs of this Agreement.

**[Remainder of Page Intentionally Blank; Signature Page Follows]**

**[Signature Page to Purchase Agreement Between FN Building, LLC, as Seller and 660 Woodward Associates, LLC, as Purchaser, Dated April 4, 2011]**

ACCORDINGLY, the undersigned have executed this Agreement as of the Execution Date.

**FN BUILDING, LLC,**
a Delaware limited liability company

By: _Lorenzo Cesare_

Name: _Lorenzo Cesare_

Its: _Managing Member_

"Seller"

**FNB DETROIT 2010 LLC**, for the sole purposes set forth in Section 7 and Paragraph 14(A) of this Agreement

By: _____

Name: _David Kriss_

Its: _Manager_

**660 WOODWARD ASSOCIATES LLC,**
a Michigan limited liability company

By: _____

Name: _____

Its: _____

"Purchaser"

**TITLE SOURCE, INC.**, solely with respect to its duties relating to the Deposit

By: _____

Name: _____

Its: _____

8963312.3

30

ACCORDINGLY, the undersigned have executed this Agreement as of the Execution Date.

FN BUILDING, LLC,
a Delaware limited liability company

FNB DETROIT 2010 LLC, for the sole purposes set forth in Section 7 and Paragraph 14(e) of this Agreement

By:_____

By:_____

    Name:_____

    Name:_____

    Its:_____

    Its:_____

"Seller"

660 WOODWARD ASSOCIATES LLC,
a Michigan limited liability company

TITLE SOURCE, INC., solely with respect to its duties relating to the Deposit

By:_____

By:_____

    Name:_____

    Name:_____

    Its:_____

    Its:_____

"Purchaser"

8963312.3

30

ACCORDINGLY, the undersigned have executed this Agreement as of the Execution Date.

FN BUILDING, LLC,
a Delaware limited liability company

By:_____

    Name:_____

    Its:_____

"Seller"

FNB DETROIT 2010 LLC, for the sole purposes set forth in Section 7 and Paragraph 14(e) of this Agreement

By:_____

    Name:_____

    Its:_____

660 WOODWARD ASSOCIATES LLC,
a Michigan limited liability company

By:_____

    Name:_____

    Its:_____

"Purchaser"

TITLE SOURCE, INC., solely with respect to its duties relating to the Deposit

By: _MendisEdwards_

Name: _MENDI S. EDWARDS_

Its: _VP Commercial Operations_

8963312.3

30

# EXHIBIT A

## DESCRIPTION OF THE PROPERTY

Real property in the City of Detroit, County of Wayne, State of Michigan, described as follows:

Lots 50, 51, 52, 53, 92, 93 and 94, in Section 1 Governor and Judges Plan, according to the plat thereof as recorded in Liber 34, Page(s) 550 of Deeds, Wayne County Records, together with that part of the vacated alley described as: Beginning at the intersection of the South line of Cadillac Square (200 feet wide) with the West line of Bates Street (60 feet wide), said point being the Northeasterly corner of Lot 48 and said Section 1 of Governor and Judges Plan; thence South 89 degrees 51 minutes West, along the South line of Cadillac Square, 120 feet to a point, said point being the Northeasterly corner of Lot 50, thence South 0 degrees 17 minutes East, along the East line of said Lot 50, 100.00 feet to a point on the North line of public alley (20.00 feet wide), said point being the Northeasterly corner and the point of beginning of parcel herein described; thence South 0 degrees 17 minutes East 20.00 feet a point on the South line of said public alley; thence South 89 degrees 51 minutes West along the South line of said public alley, 53.72 feet to a point of angle; thence South 29 degrees 25 minutes 50 seconds West along the Southeasterly line of said public alley, 30.20 feet to a point; thence North 0 degrees 17 minutes West 46.25 feet to a point on the Northerly line of said public alley; thence North 89 degrees 51 minutes East, along the Northerly line of said public alley, 68.72 feet to the place of beginning, being all that portion of the public alley situated between the rear of Lots 50 and 51, and the rear of Lots 92, 93 and 94 and the vacated alley between the three last mentioned lots, all in Section 1 of the Governor and Judges Plat of the City of Detroit and being that portion of the existing alley now bridged by the National Bank Building under permit authorized by this Common Council on, to-wit May 31, 1927 as set forth in Resolution recorded in Liber 10519, Page 39, and together with the Easement for light, air and view through, over and across all that part of the Southerly eight inches of Lot 54 and the Northerly 10 feet 4 inches of Lot 55, Section 1, Governor and Judges Plat of the City of Detroit, that is in excess of 58 feet above ground as reserved in Deed recorded in Liber 9250, Pages 314, 315, 316 and 317, Wayne County Records.

Property address: 660 Woodward

Tax ID No.: 07004105

8963312.3

**EXHIBIT B**

**ASSUMED CONTRACTS**

8963312.3

## EXHIBIT C

## RENT ROLL AND ASSUMED LEASES

8963312.3

**EXHIBIT D**

**PARKING LICENSES**

8963312.3

## EXHIBIT E

## PERMITTED EXCEPTIONS

Taxes and Assessments for 2011 and subsequent years, which are a lien but not yet due and payable.

Terms, conditions and provisions of Easement for public utilities over that portion of subject property included in the vacated alley as evidenced by instrument recorded in Liber 10519, Page 39.

Terms, conditions and provisions of Resolution recorded in Liber 25962, Page 628 and in Liber 31783, Page 440.

Terms, conditions and provisions of Corrective Action Notice to Register of Deeds recorded in Liber 29005, Page 752.

Memorandum of Lease dated November 15, 1996, and recorded December 13, 1996 in Liber 29339, Page 943 between Woodward First National LLC and AT&T Wireless PCS.

Terms and provisions set forth and contained in that certain Lease between FN Building, LLC, a Delaware limited liability company, Lessor, and United Way for Southeastern Michigan, a Michigan nonprofit corporation, Lessee, recorded in Liber 47452, Page 661.

Rights of tenants, as tenants only, under unrecorded leases as set forth on the Rent Roll.

8963312.3

# EXHIBIT F

## AFFIDAVIT AFFECTING TITLE

660 WOODWARD ASSOCIATES, LLC, a Michigan limited liability company ("660"), states as follows:

1. This Affidavit concerns real property located in the City of Detroit, Wayne County, Michigan, more particularly described as follows (the "Property"). SEE ATTACHED EXHIBIT A.

2. The Property is currently owned by FN BUILDING LLC ("Owner").

3. 660 and Owner have entered into a Purchase Agreement dated April 4, 2011, (the "Agreement") pursuant to which 660 has the right to acquire title to the Property (as defined in the Agreement).

4. This Affidavit is being made pursuant to Public Act 200 of 1945 and recorded for the purpose of evidencing and providing record notice of the Agreement and the rights, title and interest of 660 in the Property, as described above.

5. If 660 acquires title to the Property pursuant to the Agreement, the interests of Owner in the Property shall terminate.

**[Remainder of Page Intentionally Blank; Signature Page Follows]**

8963312.3

[Signature Page to Affidavit Affecting Title]

Dated: _____

660 WOODWARD ASSOCIATES, LLC

By:_____

Print:_____

Its:_____

Understood and Agreed:

FN BUILDING LLC

BY:_____

Print:_____

Its:_____

Dated: _____

STATE OF MICHIGAN    )
                     )ss
COUNTY OF _____   )

The foregoing instrument was acknowledged before me this _____ day of _____, 2011, by _____ the _____ of 660 Woodward Associates, LLC, a Michigan limited liability company, on behalf of the limited liability company.

_____

Notary Public, County, MI
Acting in _____, County
My Commission Expires:

PREPARED BY AND WHEN RECORDED RETURN TO:

Howard N. Luckoff, Esq.
Honigman Miller Schwartz and Cohn LLP
38500 Woodward Avenue
Suite 100
Bloomfield Hills, Michigan 48304-5048

8963312.3

<u>EXHIBIT B</u>

## ASSETS AND LIABILITIES

<u>Assets</u>
Real Property and misc. personal property.......................................... $ 8,175,000

<u>Liabilities</u>
City of Detroit Lien Claims............................................................ $    462,398
Mechanics Liens......................................................................... $    375,000
FNB Detroit First Mortgage ......................................................... $ 25,723,000
Priority Claims........................................................................... $     -0-
General Unsecured Claims............................................................ <u>$ 2,200,000</u>
Total                                     $28,760,398

## CHAPTER 7 LIQUIDATION ANALYSIS

<u>Assets</u>
Real Property and misc. personal property.......................................... $ 8,175,000

<u>Liabilities</u>
Administration Claims.................................................................. $    419,000
City of Detroit Lien Claims............................................................ $    462,398
Construction Liens...................................................................... $    375,000
FNB Detroit First Mortgage ......................................................... $ 7,118,602
Priority Claims........................................................................... $     0
General Unsecured Claims............................................................ <u>$     0</u>
Total                                      $ 8,175,000

Notes: All claim amounts subject to objection. Analysis assumes no surplus in Receiver account following Receivership accounting payment of Receivership claims.

**EXHIBIT B**